**MORTON INTERNATIONAL, INC., Petitioner,**

v.

**AUDITING DIVISION OF the UTAH STATE TAX COMMISSION, Respondent.**

No. 900325.

Supreme Court of Utah.

June 24, 1991.

**3.** M. Eisenberg, *The Nature of the Common Law* 4–5 (1988).

**4.** K. Llewellyn, *The Bramble Bush* 81 (rev. ed. 1950).

Randy M. Grimshaw, Maxwell A. Miller, Richard M. Marsh, Salt Lake City, for Morton Intern.

R. Paul Van Dam, Brian Tarbet, Salt Lake City, for State Tax Com'n.

HALL, Chief Justice:

Petitioner Morton International, Inc. ("Morton"), seeks review of the determination of the Utah State Tax Commission ("the Commission") that certain expenditures made in the construction of facilities used in the production of sodium azide pel-

lets and igniter material ("production facilities") are not exempt from sales and use tax under Utah Code Ann. § 59–12–104(15) or (16) (Supp.1987).

The facts underlying Morton's claims are not in dispute. In 1987, Morton began construction of facilities used in the production of sodium azide pellets and igniter material, which are components of the crash protection airbag system used in motor vehicles. The pellets and igniter material are inserted into small pressure vessels to form airbag inflaters. When the pellet is ignited, it generates nitrogen gas, which rapidly inflates the airbag. Morton has manufactured sodium azide pellets for over a decade. The new facilities, however, constitute a significant expansion of this business.

The process of manufacturing sodium azide pellets and igniter material is unique and highly specialized. The chemicals used in the process are extremely energetic, explosive, and toxic. Accordingly, the facilities were specifically designed to incorporate safety and environmental features and support specialized and massive equipment, some of which is suspended above the floor. For example, separate facilities were built for each stage of production. This was done to minimize the risk to personnel, machinery, and equipment in case of fire, explosion, or chemical contaminant reactions. There are also many environmental features that are incorporated into the buildings themselves, such as, heavy metal free areas, special conductive flooring, protective blast and blowout walls and ceilings, chemical dust collection filters, and protected double-walled piping and sumps. Many of the production areas are operated by remote control. Personnel only enter for maintenance and quality control. Due to the toxic nature of the materials, personnel are not allowed in these areas without protective clothing, including respirators.

On June 26, 1989, Morton initiated this action. By stipulation, it was agreed that the action would be treated as a request for refund and formal hearing. A hearing was held on March 7, 1990. At the hearing, Morton represented that since 1987, it had paid an excess of $325,000 in sales and use taxes with respect to the construction of its sodium azide pellet production facilities. Morton contended that it was entitled to a refund of sales and use taxes pursuant to section 59–12–104(15) on the ground that the production facilities were a "synthetic fuel processing and upgrading plant" and, alternatively, pursuant to section 59–12–104(16), on the ground that the production facilities function as, and essentially are, "equipment." On June 7, 1990, the Commission issued its findings of fact, conclusions of law, and final decision determining that the fuel pellets were not a synthetic fuel and thus the production facilities did not qualify for an exemption under section 59–12–104(15). The Commission also determined that Morton's production facilities were real property and thus the sale of materials used in construction of the production facilities did not constitute the sale of equipment under section 59–12–104(16).

On July 27, 1990, Morton filed this petition for review. The general issue before this court is whether the Commission erred in concluding that the sale of certain materials used in the construction of Morton's production facilities is not exempt from sales and use tax under Utah Code Ann. § 59–12–104(15) or (16).

## I. STANDARD OF REVIEW

### A. Administrative Procedure Act

The instant case was initiated after January 1, 1988, and the Commission's decision was reached following a formal hearing. Therefore, the applicable standard of review of the Commission's action is set out in the Utah Administrative Procedure Act, Utah Code Ann. § 63–46b–16,[1] which provides in pertinent part:

(1) As provided by statute, the Supreme Court or the Court of Appeals has

1. Utah Code Ann. § 63–46b–22 (1987) provides: "(1) The procedures for agency action, agency review, and judicial review contained in this chapter are applicable to all agency adjudicative proceedings commenced by or before an agency on and after January 1, 1988."

jurisdiction to review all final agency action resulting from formal adjudicative proceedings.

. . . .

(4) The appellate court shall grant relief only if, on the basis of the agency's record, it determines that a person seeking judicial review has been substantially prejudiced by any of the following:

. . . ;

(d) the agency has erroneously interpreted or applied the law;

. . . ;

(h) the agency action is:

(i) an abuse of the discretion delegated to the agency by statute;

(ii) contrary to a rule of the agency;

(iii) contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency; or

(iv) otherwise arbitrary or capricious.

■ The Commission maintains that section 63–46b–16(4) grants agencies greater discretion than they had under prior case law. This argument is based on the language in section 63–46b–16(4) stating that appellate relief can only be granted if "on the basis of the agency's record" the appellate court determines that a person has been "substantially prejudiced." We have always based our decisions on the agency's record. Therefore, this requirement does not disturb prior case law.[2] Furthermore, section 63–46b–16(4) deals with judicial relief, not judicial review. It is clear from this language that this section does not affect the degree of deference an appellate court grants to an agency's decision.[3] Rather, section 63–46b–16(4) ensures that relief should not be granted when, although the agency committed error, the error was harmless. Indeed, the language of section 63–46b–16(4) is similar to language in rules of procedure and evidence dealing with harmless error.[4] Given this similarity in language, we conclude that the legislature in enacting section 63–46b–16(4) intended that the same standard used for determining the harmfulness of error in appeals from judicial proceedings should apply to reviews of agency actions. Under this standard, an error will be harmless if it is "sufficiently inconsequential that . . . there is no reasonable likelihood that the error affected the outcome of the proceedings."[5]

Section 63–46b–16(4)(a) through (h), however, incorporates standards that appellate courts are to employ when reviewing allegations of agency error.[6] Morton's claims

---

2. *See Salt Lake City Corp. v. Department of Employment Sec.*, 657 P.2d 1312, 1316 (Utah 1982); *see also* Comments of the Utah Administrative Law Advisory Committee, Utah A.P.A. at 15 (Code Co Law Publishers, April 25, 1988) [hereinafter Advisory Committee].

3. The comments of the Utah Administrative Law Advisory Committee state that section 63–46b–16(4) is patterned after comparable provisions of the Model State Administrative Procedure Act ("MSAPA"). *See* Model State Admin. Procedure Act § 5–116, 15 U.L.A. 127–30 (1981). Section 5–116 of the MSAPA requires the showing of substantial prejudice for an appellate court to grant relief. It is clear from reading the comments to section 5–116 that the requirement of substantial prejudice does not require appellate courts to grant administrative agencies deference. Indeed, the comments state that appellate courts "may decide that the agency has erroneously interpreted the law if the court merely disagrees with the agency's interpretation."

4. *See* Utah R.Civ.P. 61; Utah R.Crim.P. 30(a); Utah R.Evid. 103(a).

5. *State v. Verde*, 770 P.2d 116, 120 (Utah 1989). In a case such as the instant case, where we reject the argument that an agency has erred, this provision has no application.

6. The Utah Court of Appeals has interpreted section 63–46b–16(4)(a) through (h) as establishing standards of review that differ, in some cases, from our prior case law. *See Grace Drilling Co. v. Board of Review*, 776 P.2d 63, 66–68 (Utah Ct.App.1989) (different standard for reviewing agency action based on determination of fact); *see also* Advisory Committee at 15; MSAPA § 5–116, comments, 15 U.L.A. at 127–30. *But see Pro–Benefit Staffing v. Board of Review*, 775 P.2d 439, 441–42 (Utah Ct.App. 1989) (same standard for applying the law). We note that the analysis used in *Pro–Benefit* is inconsistent with the analysis expressed in this opinion.

are based on subsections 63–46b–16(4)(d), (4)(h)(iii), and (4)(h)(iv). The question presented, therefore, is whether the standard of review incorporated into these subsections differs from the standard of review developed in our prior case law.

### B. Prior Case Law

Prior to the adoption of the Utah Administrative Procedure Act, the Utah courts developed three levels of review in connection with agency action. First, agencies' findings of fact were granted considerable deference and would not be disturbed on appeal if supported by substantial evidence.[7] Second, a correction-of-error standard, giving no deference to agencies' decisions, was used to review agencies' rulings on issues the court characterized as concerning general law.[8] Examples of issues characterized as questions of general law include rulings concerning constitutional questions,[9] rulings concerning the agency's jurisdiction or statutory authority,[10] rulings

concerning common law principles such as the interpretation of contracts and certificates,[11] and rulings concerning interpretation of statutes unrelated to the agency.[12]

The correction-of-error standard was also used to review an agency's construction of, or application of the findings of fact to, the statutes which the agency is empowered to administer—when the agency's experience or expertise is not helpful in resolving the issue.[13] One example of such a situation is when a question of statutory interpretation turns on basic legislative intent.[14] Other examples include situations where the agency is construing ordinary statutory terms within the statutes which they administer, such as, application of limitation period under the workers' compensation act,[15] and the proper construction of the term "deficiency of service."[16] In fact, in any situation involving the application of the legal rules to the findings of fact, a correction-of-error standard is used if the court is as well-suited to determine the

---

7. *See, e.g., Savage Indus. Inc. v. Utah State Tax Comm'n,* 811 P.2d 664, 666 (Utah 1991); *Hurley v. Board of Review,* 767 P.2d 524, 526 (Utah 1988); *Bennett v. Indus. Comm'n,* 726 P.2d 427, 429 (Utah 1986); *Big K Corp. v. Public Serv. Comm'n,* 689 P.2d 1349, 1353 (Utah 1984). See also section 63–46b–16(4)(g) of the Utah Administrative Procedure Act, which provides that a party who is substantially prejudiced by an agency action can seek judicial relief on the ground that "the agency action is based upon a determination of fact, made or implied by the agency, that is not supported by substantial evidence when viewed in light of the whole record before the court."

8. *See Savage Indus.,* 811 P.2d at 666; *Utah Dep't of Admin. Serv. v. Public Serv. Comm'n,* 658 P.2d 601, 608 (Utah 1983).

9. *See Savage Indus.,* 811 P.2d at 666; *Utah Dep't of Admin. Serv.,* 658 P.2d at 608; *R.W. Jones Trucking v. Public Serv. Comm'n,* 649 P.2d 628, 629 (Utah 1982). See also Utah Administrative Procedure Act section 63–46b–16(4)(a), which provides that a party who is substantially prejudiced by an agency action may seek judicial relief on the ground that "the agency action, or the statute or rule on which the agency action is based, is unconstitutional on its face or as applied."

10. *See, e.g., Utah Dep't of Admin. Serv.,* 658 P.2d at 608; *Utah Cable Television Operator Ass'n v. Public Serv. Comm'n,* 656 P.2d 398, 402–03

(Utah 1982). See also Utah Administrative Procedure Act section 63–46b–16(4)(b), which provides that a party who is substantially prejudiced by an agency action can seek judicial relief on the ground that "the agency has acted beyond the jurisdiction conferred by any statute."

11. *See Utah Dep't of Admin. Serv.,* 658 P.2d at 608; *W.S. Hatch Co. v. Public Serv. Comm'n,* 3 Utah 2d 7, 277 P.2d 809, 811 (Utah 1954). *But see Savage Bros. Inc. v. Public Serv. Comm'n,* 723 P.2d 1085, 1087 (Utah 1986) (interpretation of certificate of public convenience granted deference when agency's expertise is helpful in interpreting ambiguous and technical terms).

12. *See generally Hurley,* 767 P.2d at 527; *Bennett,* 726 P.2d at 429. Both cases state that no deference is granted to an agency's interpretation of statutes or application of statutory terms to factual situations unless the agency, by virtue of its expertise, is in a better position to give effect to the regulatory objective.

13. *See, e.g., Hurley,* 767 P.2d at 527; *Bennett,* 726 P.2d at 429; *Big K Corp.,* 689 P.2d at 1353.

14. *See Hurley,* 767 P.2d at 527; *Big K Corp.,* 689 P.2d at 1353.

15. *Dean Evans Chrysler Plymouth v. Morse,* 692 P.2d 779, 782 (Utah 1984).

16. *Big K Corp.,* 689 P.2d at 1353.

issue as the agency.[17]

Finally, an intermediate standard of review, granting some deference to the agency's decisions, has been used when the agency's experience or expertise puts the agency in a better position to resolve issues concerning the application of findings of fact to the legal rules governing the case and the interpretations of the operative provisions of the statutes the agency is empowered to administer.[18] This standard was also used when it was alleged that the agency abused the discretion granted to it by statute.[19] Under the intermediate standard of review, appellate courts did not disturb an agency's decision if the decision was within the bounds of reasonableness.[20]

In cases not involving discretion, it has not always been clear when the intermediate standard of review should be used.[21] In some early cases, we characterized the issues that are appropriate for the intermediate standard of review as questions of mixed fact and law [22] or, alternatively, as questions concerning the application of the law.[23] However, issues that are appropriate for the intermediate standard have also been described as questions of statutory construction,[24] questions of special law,[25] and questions of law.[26] Indeed, we have stated, "An agency's interpretation of key provisions of the statute that it is empowered to administer is often inseparable from its application of the rules of law to the basic facts." [27]

■ A review of our recent cases, however, makes it clear that it is not the characterization of an issue as a mixed question of fact and law or the characterization of the issue as a question of general law that is dispositive of the determination of the appropriate level of judicial review. Rather, what has developed as the dispositive factor is whether the agency, by virtue of its experience or expertise, is in a better position than the courts to give effect to the regulatory objective to be achieved.[28] We have stated:

We do not defer to the Commission when construing statutory terms or when applying statutory terms to the facts unless the construction of the statutory lan-

17. *See, e.g., Hurley,* 767 P.2d at 527; *Bennett,* 726 P.2d at 429; *Big K Corp.,* 689 P.2d at 1353.

18. *See, e.g., Savage Indus.,* 811 P.2d at 666; *Hurley,* 767 P.2d at 527; *Logan Regional Hosp. v. Board of Review,* 723 P.2d 427, 428–29 (Utah 1986); *Savage Bros. Inc.,* 723 P.2d at 1087; *Barney v. Department of Employment Sec.,* 681 P.2d 1273, 1275 (Utah 1984).

19. *See, e.g., Big K Corp.,* 689 P.2d at 1353; *Salt Lake City Corp. v. Department of Employment Sec.,* 657 P.2d 1312, 1316 (Utah 1982).

20. *See, e.g., Savage Indus.,* 811 P.2d at 666; *Hurley,* 767 P.2d at 527; *Logan Regional Hosp.,* 723 P.2d at 428–29; *Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

21. *See Savage Indus.,* 811 P.2d at 666. *Compare Bennett,* 726 P.2d at 429 (correction-of-error standard used to review Industrial Commission's interpretation of "employee") *with Pinter Constr. Corp. v. Frisby,* 678 P.2d 305, 307 (Utah 1984) (intermediate standard used to review Industrial Commission's interpretation of "employee").

22. *See, e.g., Hurley,* 767 P.2d at 527; *Logan Regional Hosp.,* 723 P.2d at 429; *Gray v. Department of Employment Sec.,* 681 P.2d 807, 810 (Utah 1984); *Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

23. Mixed questions of fact and law have been defined as " 'the "application" of the findings of basic fact (e.g., what happened) to the legal rules governing the case.' " *Gray,* 681 P.2d at 811 n. 7 (quoting *Utah Dep't of Admin. Serv.,* 658 P.2d at 610). This court has used the terms mixed question of fact and law and application of the law interchangeably. *See Hurley,* 767 P.2d at 527–28; *Logan Regional Hosp.,* 723 P.2d at 429; *Barney,* 681 P.2d at 1275; *Clearfield City v. Department of Employment Sec.,* 663 P.2d 440, 443–44 (Utah 1983).

24. *See Chris & Dick's v. State Tax Comm'n,* 791 P.2d 511, 513–14 (Utah 1990); *Bennett,* 726 P.2d at 429; *Big K Corp.,* 689 P.2d at 1353; *Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

25. *See Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

26. *See Chris & Dick's,* 791 P.2d at 513–14; *Hurley,* 767 P.2d at 527; *Bennett,* 726 P.2d at 429; *Big K Corp.,* 689 P.2d at 1353; *Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

27. *Utah Dep't of Admin. Serv.,* 658 P.2d at 610.

28. *Savage Indus.,* 811 P.2d at 666; *Chris & Dick's,* 791 P.2d at 513–14; *Hurley,* 767 P.2d at 527; *Bennett,* 726 P.2d at 429; *Big K Corp.,* 689 P.2d at 1353.

guage or the application of the law to the facts should be subject to the Commission's expertise gleaned from its accumulated practical, first-hand experience with the subject matter.[29]

A clear example of this principle can be seen in *Savage Brothers Inc. v. Public Service Commission.*[30] There, we noted that questions involving interpretations of certificates of public convenience and necessity ordinarily involve questions of general law. However, we held that when an agency has specialized knowledge that is helpful in interpreting ambiguous and technical terms of a certificate, an intermediate standard of review is appropriate.[31]

In determining whether the standards of review incorporated in subsections 63–46b–16(4)(d), (4)(h)(iii), and (4)(h)(iv) differ from the standards established in our prior case law, we will address each section separately in the context of the claim raised under that section.

## II. STATUTORY CONSTRUCTION

### A. Section 63–46b–16(4)(d)

Morton's claim that it is entitled to judicial relief under section 63–46b–16(4)(d) is based on the allegation that the Commission erred in its construction of Utah Code Ann. § 59–12–104(15) and (16) or in its application of these subsections to the findings of fact. Under our prior case law, the standard used to review the Commission's determinations would be a correction-of-er-

ror standard unless the Commission was granted some discretion in dealing with the issue or, by virtue of its expertise or experience, was in a superior position to decide the issue. The first question presented, therefore, is whether section 63–46b–16(4) departs from this standard.

It has already been established that in some situations, the standard of review provided in section 63–46b–16(4)(d) is identical to the standard of review in our prior case law. In *Savage Industries Inc. v. Utah State Tax Commission,*[32] we held that under section 63–46b–16(4)(d), a correction-of-error standard, giving no deference to the agency decisions, is to be used in cases involving statutory construction where the court is in as good a position as the agency to interpret the statute.[33] This holding was based on the term "erroneous," which connotes a correction-of-error standard,[34] and the legislative history of section 63–46b–16(4)(d), which implies that " 'a court may decide that the agency has erroneously interpreted the law if the court merely disagrees with the agency's interpretation.' "[35] Similarly, section 63–46b–16(4)(h)(i) provides for judicial relief in cases where the agency has abused the "discretion delegated to the agency by statute."[36] In past cases, we have held that an agency has abused its discretion when the agency's action, viewed in the context of the language and purpose of the governing statute, is unreasonable.[37]

---

29. *Bennett,* 726 P.2d at 429.

30. 723 P.2d 1085 (Utah 1986).

31. *Id.* at 1087.

32. 811 P.2d 664, 668–671 (Utah 1991).

33. *Id.* at 668.

34. *Id.* at 670.

35. *Id.* at 670 (citing MSAPA § 5–116, comments, 15 U.L.A. at 128 (1981)).

36. The legislative history of section 63–46b–16(4)(d) also supports this position. The comments of the Utah Administrative Procedure Act state that section 63–46b–16(4)(d) is patterned after comparable provisions in the MSAPA. The comments to the relevant section of the MSAPA state that "the enabling statute normally

confers some discretion upon the agency. Accordingly, a court should find reversible error in the agency's application of the law only if the agency has improperly exercised its discretion." *See* MSAPA § 5–116, comments, 15 U.L.A. at 128.

37. *See Salt Lake City Corp. v. Department of Employment Sec.,* 657 P.2d 1312, 1316 (Utah 1982); *West Jordan v. Department of Employment Sec.,* 656 P.2d 411, 414 (Utah 1982); *cf. Utah Dep't of Admin. Serv. v. Public Serv. Comm'n,* 658 P.2d 601, 611–12 (Utah 1983). Focusing on the legislative grant of authority is important in determining whether an agency has abused its discretion. The court should be careful not to substitute its judgment for the judgment of the agency when considering the wisdom of the agency's policies. *See* Advisory Committee at 15; *see also* MSAPA § 5–116, comments, 15 U.L.A. at 128 (1981).

Therefore, in cases dealing with statutory construction, the Utah Administrative Procedure Act does not change the standard of review when the court is in as good a position as the agency to determine the issue or when the agency has been granted discretion in interpreting the statute. However, nothing in the language of section 63–46b–16 or its legislative history suggests that an agency's decision is entitled to deference solely on the basis of agency expertise or experience. Indeed, there is no reference to agency expertise or experience in the statute or the statute's legislative history. Rather, in granting judicial relief when an "agency has erroneously interpreted or applied the law," the language of section 63–46b–16(4) clearly indicates that absent a grant of discretion, a correction-of-error standard is used in reviewing an agency's interpretation or application of a statutory term.[38] Therefore, to the extent that our cases can be read as granting deference to an agency's decisions based solely on the agency's expertise and not on a statutory delegation of authority, section 63–46b–16(4)(h)(i) constitutes a break from prior law.[39]

This, however, may not have a significant effect on the standard used to review agencies' statutory interpretations and applications of their own statutes. In many cases where we would summarily grant an agency deference on the basis of its expertise, it is also appropriate to grant the agency deference on the basis of an explicit or implicit grant of discretion contained in the governing statute.

The legislature, in many instances, has explicitly granted agencies discretion in dealing with specific statutory terms.[40] Apart from such explicit grants of authority, courts have also recognized that grants of discretion may be implied from the statutory language. For example, we have held that when the operative terms of a statute are broad and generalized, these terms "bespeak a legislative intent to delegate their interpretation to the responsible agency."[41] We have also granted an agency's statutory interpretation deference when the statutory language suggested that the legislature had left the specific question at issue unresolved. In *Salt Lake City Corp. v. Confer*,[42] we held that an agency's interpretation of statutory provisions is entitled to deference when there is more than one permissible reading of the statute and no basis in the statutory language or the legislative history to prefer one interpretation over another.[43]

■ The approach used in *Salt Lake City Corp.* is consistent with section 63–46b–16. Questions of legislative intent are considered questions of law, which are reviewed for correctness under our prior case

---

**38.** As noted *supra* in notes 21–27 and accompanying text, in some of our earlier cases, in determining that an intermediate standard of review is appropriate, we have relied upon the characterization of an issue as an application of the law as opposed to an interpretation of the law. Although in our more recent cases the focus has turned to agency expertise, the fact that the Administrative Procedure Act incorporates the terms "application of the law" and "interpretation of the law" under a single standard supports the contention that absent a grant of discretion, an agency's interpretation or application of statutory terms should be reviewed for error.

**39.** In fact, the legislative history of the Administrative Procedure Act suggests that the legislature intended to alter the approach the courts developed to review agency action. *See* Sullivan, *Overview of the Utah Administrative Procedures Act*, Utah A.P.A. at 4–5 (Code Co Publishers July 8, 1988).

**40.** For example, section 59–12–104(16) provides for "sales or leases of machinery and equipment purchased or leased by a manufacturer for use in new or expanding operations (excluding normal operating replacements ... *as determined by the commission* )." (Emphasis added.)

**41.** *Utah Dep't of Admin. Serv.*, 658 P.2d at 610; *see also Salt Lake City Corp.*, 657 P.2d at 1316–17 (term "equity and good conscience" confers broad discretion).

**42.** 674 P.2d 632 (Utah 1983).

**43.** *Id.* at 636. The United States Supreme Court has recently adopted a similar approach. *See Dole v. United Steelworkers of America*, 494 U.S. 26, ——, 110 S.Ct. 929, 938, 108 L.Ed.2d 23 (1990); *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 841, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

law [44] and section 63–46b–16(4)(d). Therefore, when a legislative intent concerning the specific question at issue can be derived through traditional methods of statutory construction, the agency's interpretation will be granted no deference and the statute will be interpreted in accord with its legislative intent.[45] However, in the absence of a discernible legislative intent concerning the specific question in issue, a choice among permissible interpretations of a statute is largely a policy determination. The agency that has been granted authority to administer the statute is the appropriate body to make such a determination.[46] Indeed, both the legislative history to section 63–46b–16 [47] and our prior cases [48] suggest that an appellate court should not substitute its judgment for the agency's judgment concerning the wisdom of the agency's policy. When there is no discernible legislative intent concerning a specific issue the legislature has, in effect, left the issue unresolved. In such a case, it is appropriate to conclude that the legislature has delegated authority to the agency to decide the issue. Such an approach is particularly appropriate when it is reasonable to assume that the legislature intended the agency to have some discretion in dealing with the statutory provision at issue.

■ We do not mean to suggest that these are the only methods of determining whether the legislature has granted the agency discretion in dealing with an issue. However, it is clear from the wording of section 63–46b–16 that an agency's statutory construction should only be given deference when there is a grant of discretion to the agency concerning the language in question, either expressly made in the statute or implied from the statutory language.

## B. Section 59–12–104(15)

Morton's first argument is that the sale of certain materials, machinery, and equipment used in the construction of its production facilities is exempt from sales and use tax under Utah Code Ann. § 59–12–104(15), which provides:

The following sales and uses are exempt from taxes imposed by this chapter:

. . . .

(15) sales or leases of materials, machinery, equipment, and services of any person in excess of $500,000 for any tax year used in the new construction, expansion, or modernization (excluding normal operating replacements as determined by the commission) of any mine, mill, reduction works, smelter, refinery (except oil and gas refineries), *synthetic fuel processing and upgrading plant,* rolling mill, coal washing plant, or melting facility in Utah commencing after July 1, 1984, and ending June 30, 1989.[49]

Morton argues that the sodium azide pellets are synthetic fuels and that, therefore, Morton's facilities constitute a "synthetic fuel processing and upgrading plant" as that term is used in section 59–12–104(15).

■ The question presented is one of statutory construction or application, and absent a grant of discretion, the Commission's decision will be reviewed under a correction-of-error standard. The statutory terms in question are of a specific nature and do not connote a general grant of discretion. Furthermore, the precise issue presented, whether facilities such as those in question can be considered synthetic fuel processing and upgrading plants, can be resolved through the use of traditional rules of statutory construction.[50] It is apparent that the Commission has not been granted any discretion in re-

---

44. *See Savage Indus.,* 811 P.2d at 666, 670; *Hurley v. Board of Review,* 767 P.2d 524, 527 (Utah 1988).

45. *See Savage Indus.* at 670; *Hurley,* 767 P.2d at 527.

46. *See Salt Lake City Corp.,* 674 P.2d at 636; *Utah Dep't of Admin. Serv.,* 658 P.2d at 611.

47. *See* Advisory Committee at 15; *see also* MSA-PA § 5–116, comments, 15 U.L.A. at 128.

48. *See Salt Lake City Corp.,* 674 P.2d at 636; *Utah Dep't of Admin. Serv.,* 658 P.2d at 611.

49. Utah Code Ann. § 59–12–104(15) (emphasis added).

50. *See infra* notes 51–56 and accompanying text.

gard to the present issue. Therefore, its interpretation will not be given deference.

■ Morton's interpretation of section 59-12-104(15) is based on the well-established rule of statutory construction that a statutory term should be interpreted and applied according to its usually accepted meaning, where the ordinary meaning of the term results in an application that is neither unreasonably confused, inoperable, nor in blatant contradiction of the express purpose of the statute.[51] It is argued that the usual meaning of the term "synthetic," as defined by *Webster's New Collegiate Dictionary*, is "relating to or involving synthesis; produced artificially; man-made." The usual meaning of the term "fuel," according to *Webster's*, is a "material used to produce heat or power by burning." Morton then combines these definitions to produce an interpretation of the term "synthetic fuel" as "a man-made fuel that could be combusted or consumed to produce heat or light." Under such an interpretation of section 59-12-104(15), the sodium azide pellets would qualify as a synthetic fuel.

While the analysis used in reaching this point ignores other relevant and well-established rules of statutory construction, it is not necessary to rely on other rules of construction to conclude that Morton's interpretation is erroneous. This is because the rule cited for Morton's interpretation does not support its position. First, it is apparent from the record that there is no usual and accepted meaning of the term "synthetic fuel." Testimony at the hearing established that there is conflict within the scientific community concerning the accepted meaning of the term. Indeed, in several points in its brief, Morton claims that there is confusion concerning the accepted meaning of the term "synthetic fuel." Though we have relied on dictionary definitions to determine the usual meaning of statutory terms, the term "synthetic fuel" is not defined in the dictionary. When it is admitted that there is no accepted meaning of the statutory term at issue, a method of construction which is based solely on one of many possible definitions is inappropriate.

Second, even assuming that Morton's definition is appropriate, the argument necessarily fails because Morton misapplies the rule. Morton argues that despite the confusion as to the meaning of "synthetic fuel," the term should be defined by combining the strict dictionary definitions of "synthetic" and "fuel." Under such a definition, any man-made material capable of burning would qualify as a synthetic fuel. Taking Morton's analysis one step further, any facility that produces a material capable of burning would qualify as a "synthetic fuel processing and upgrading plant." Morton attempts to avoid such a result by arguing that a requirement not found in the definition of either "synthetic" or "fuel"—the requirement that it must be economical to produce heat or energy from a man-made material—should be read into the definition of "synthetic fuel." Morton claims that such an interpretation is justified in order to avoid absurd results. This argument, however, is a misstatement of the very rule upon which Morton relies. When the use of an ordinary meaning of a statutory term results in a statute that is "confused beyond reason,"[52] the court does not resolve the confusion by modifying the ordinary meaning of the term. Rather, in such cases the method of construction urged by Morton is not employed.[53]

■ However, other methods of construction can be used to determine the application of the phrase "synthetic fuel processing and upgrading plant" when the meaning of the phrase cannot be arrived at through use of the usual meaning of the term. One such method of statutory construction is the rule of *noscitur a sociis*, which provides that the meaning of ques-

**51.** *West Jordan v. Morrison,* 656 P.2d 445, 446 (Utah 1982); *see also Board of Educ. of Granite School Dist. v. Salt Lake City,* 659 P.2d 1030, 1035 (Utah 1983); *Gord v. Salt Lake City,* 20 Utah 2d 138, 434 P.2d 449, 451 (Utah 1967).

**52.** *Gord,* 434 P.2d at 451.

**53.** *See Board of Educ. of Granite School Dist.,* 659 P.2d at 1035; *Morrison,* 656 P.2d at 446; *Gord,* 434 P.2d at 451.

tionable words and phrases in a statute be ascertained by reference to words or phrases associated with them.[54] The terms surrounding "synthetic fuel processing and upgrading plant" all relate to different aspects of the mining or material reclamation operations. This suggests that the term "synthetic fuel processing and upgrading plant" should be interpreted in accordance with the term's relationship to the mining industry. Such an approach is also consistent with the legislative history of section 59–12–104(15). Both Morton and the Commission assert that the legislative history reveals that section 59–12–104(15) was enacted to aid Utah's ailing mining industry.

At the hearing, Dr. Wiser, a professor of fuel engineering at the University of Utah, offered a definition of "synthetic fuel processing and upgrading plant" that is consistent with the language and legislative history of section 59–12–104(15). Dr. Wiser stated that in the synthetic fuel industry, the term "synthetic fuel processing and upgrading plant" refers to a plant which produces a liquid material that can be further refined into a synthetic fuel by removing the impurities from raw materials other than petroleum and natural gas, such as coal, tar sands, oil shale, and organic waste. Dr. Wiser further testified that a synthetic fuel is a liquid or gaseous material produced from such raw materials used in combustion primarily for the production of energy. The requirement that a synthetic fuel be gaseous or liquid is linked to the purpose of developing synthetic fuels, which is to take the pressure off of petroleum and natural gas and to reduce dependence on foreign oil.

■ This definition, to the extent that it focuses on mined materials such as coal, tar sands, and oil shale, is consistent with the language and legislative history of sec-

tion 59–12–104(15). Because the definition offered by Dr. Wiser focuses on "processing and upgrading plant" as well as "synthetic fuel," it is also consistent with the rule of statutory construction which provides that terms of a statute are to be interpreted as a comprehensive whole and not in a piecemeal fashion.[55] It should also be noted that this narrow definition limits the exception granted under section 59–12–104(15). Therefore, the approach suggested by Dr. Wiser is consistent with the well-established principle that tax exemption statutes are to be strictly construed against the party claiming the exemption and all ambiguities are to be resolved in favor of taxation.[56]

There is ample support from the wording of the statute, the statute's legislative history, and other methods of statutory construction to conclude that the legislature, in enacting section 59–12–104(15), intended to grant an exemption for materials used in the construction of the type of plant Dr. Wiser described: that is, a plant which removes impurities from natural resources such as coal, oil shale, and tar sands to produce a liquid or gaseous material meant to be used in combustion for the production of energy. It is also clear that given this construction, Morton's production facilities do not qualify as a synthetic fuel processing and upgrading plant. The Commission, therefore, did not err in determining that the materials used in the construction of Morton's facilities do not qualify for an exemption under section 59–12–104(15).

### C. Section 59–12–104(16)

■ Morton argues that the shells of its production facilities, i.e., the foundations, walls, floors, and ceilings, constitute equipment. Therefore, the construction of the facilities constitutes a purchase of equipment under 59–12–104(16), which provides:

---

54. See Heathman v. Giles, 13 Utah 2d 368, 374 P.2d 839, 840 (1962); W.S. Hatch Co. v. Public Serv. Comm'n, 3 Utah 2d 7, 277 P.2d 809, 812 (1954); Perris v. Perris, 115 Utah 128, 202 P.2d 731, 733 (1949); see also Dole, 494 U.S. at ——, 110 S.Ct. at 935.

55. Clover v. Snowbird, 808 P.2d 1037, 1045 (Utah 1991); Peay v. Board of Educ. of Provo

City Schools, 14 Utah 2d 63, 377 P.2d 490, 492 (1962).

56. Parson Asphalt Prods., Inc. v. Utah State Tax Comm'n, 617 P.2d 397, 398 (Utah 1980); Great Salt Lake Minerals v. State Tax Comm'n, 573 P.2d 337, 340 (Utah 1977); Salt Lake County v. Tax Comm'n, Utah ex rel. Good Shepherd Lutheran Church, 548 P.2d 630, 631 (Utah 1976).

The following sales and uses are exempt from taxes imposed by the chapter:

....

(16) sales or leases of machinery and *equipment* purchased or leased by a manufacturer for use in new or expanding operations (excluding normal operating replacements, which includes replacement machinery and equipment even though they may increase plant production or capacity, as determined by the commission) in any manufacturing facility in Utah.[57]

Morton's argument is based on the assertion that the shells of its production facilities function as equipment by preventing, localizing, and directing accidental explosions, preventing toxic exposure to workers and the environment, providing structural support for specialized pieces of machinery, and providing access to machinery. The Commission rejected this argument, determining that the facilities constitute real property not subject to an exemption under section 59-12-104(16).

The specific issue presented on appeal, therefore, is whether the term "equipment," as used in section 59-12-104(16), refers to structures that have characteristics of improvements to real property, but also have characteristics of equipment in that they provide safety features, support for machinery, and access to machinery. This is a question of statutory construction or application and absent a grant of discretion, the Commission's decision will be reviewed for correctness.[58]

There is no explicit grant of authority regarding the question of what constitutes "equipment" under section 59-12-104(16). It is also true that the precise question at issue cannot be resolved using traditional methods of statutory construction. The usual meaning of the term "equipment" is fixed assets of a business enterprise not including real property and buildings.[59] This, however, does not resolve the issue. Morton does not claim that buildings should qualify as an exemption under section 59-12-104(16). Rather, Morton's argument is that the shells of its production facilities are so specialized and so intricately connected to the function of the machinery that they do not constitute buildings, in the traditional sense, but are essentially equipment. The other terms of the statute are not helpful, and the legislative history is not, as in the case of section 59-12-104(15), specific enough to provide much guidance.[60]

Indeed, it seems that the legislature left unresolved the more general question of whether structures having characteristics of real property as well as characteristics of equipment can qualify for an exemption under section 59-12-104(16), let alone the more specific issue asserted in this appeal. It should also be noted that the classification of a structure as real property or equipment is the type of determination the Commission routinely performs. Thus, it is reasonable to assume that the legislature granted the Commission discretion in this area. Given these facts, we conclude that the Commission has been granted discretion in interpreting the term "equipment." The decision of the Commission, therefore, will only be overturned if it is unreasonable.[61]

In determining whether the Commission's decision is reasonable, it must be noted that the Commission has promulgated a rule that expressly excludes real property and improvements to real property from the definition of equipment, as that

---

57. Utah Code Ann. § 59-12-104(16) (emphasis added).

58. *See* Utah Code Ann. § 63-46b-16(4).

59. *See Webster's New Third International Dictionary* 768 (14th ed. 1961).

60. The legislative history of section 59-12-104(16) suggests that the section was enacted to provide incentives for the expansion of manufacturing plants. Morton claims that since the act was meant to provide incentives to manufacturers, the term "equipment" should be given an expansive interpretation; such an assertion is controverted by the rule that tax exemption statutes are to be strictly construed. *See Parson Asphalt Prods. Inc.,* 617 P.2d at 398; *Great Salt Lake Minerals,* 573 P.2d at 340; *Salt Lake County,* 548 P.2d at 631.

61. *See supra* notes 36-39 and accompanying text.

term is used in section 59–12–104(16). Rule 865–19–85S provides:

2. "Equipment" means any independent device separated from any machinery but essential to an integrated or continuous manufacturing or assembling process or any sub unit thereof....

. . . .

B. Application of Exemption:

1. The machinery and equipment exemption applies only to tangible personal property. It does not apply to real property or to tangible personal property which is purchased and becomes an improvement to real property.

Morton does not challenge the propriety of rule 865–19–85S. In fact, Morton's argument relies heavily on the language of the rule.[62]

Morton argues that because the term "equipment" is not defined in the tax code or Utah case law, this court should look to other jurisdictions for guidance. Specifically, Morton cites cases from Wisconsin[63] and the federal bench[64] that have focused on the function that the particular structure performs in determining if the structure should be considered equipment.[65] It is argued that we should adopt this approach because it was developed under statutes that are similar to rule 865–19–85S, that is, tax statutes granting exemptions for machinery and equipment but not for building or building structures.[66] Implicit in Morton's argument is the assertion that under a functional analysis, the facilities in question would qualify as equipment.

There are, however, many difficulties with Morton's argument. It is rule 865–19–85S, not section 59–12–104(16), that is similar to the statutes cited by Morton. Yet Morton has cited no cases where this court has looked to another jurisdiction's statutes to aid in the interpretation of an agency's rule. In situations like the instant case, where the Commission has been granted discretion to interpret the term "equipment" and therefore discretion in interpreting rule 865–19–85S,[67] other jurisdictions' rulings are not as salient as they may be in situations dealing with strict statutory construction. Furthermore, though there are similarities between rule 865–19–85S and the statutes Morton cites, the statutes and rule 865–19–85S are not identical. None of the statutes upon which Morton relies involve sales and use tax. Moreover, under rule 865–19–85S, the tax exemption does not apply to real property and improvements to real property, while

---

**62.** Because Morton asserts that the Commission erred in interpreting section 59–12–104(16), the Commission's determination must be reviewed under section 64–46b–16(4)(d) of the Administrative Procedure Act. Morton's argument, however, relies more on the wording of rule 865–19–85S than on the language of section 59–12–104(16). The instant case, therefore, may present a situation more appropriately reviewed under section 63–46b–16(4)(h)(ii) of the Administrative Procedure Act, i.e., the agency's action is "contrary to a rule of the agency," rather than under section 64–46b–16(4)(d). Morton has not asserted this claim. In any event, since we have already held that the Commission has been granted discretion in interpreting the term "equipment," as used in section 59–12–104(16), and rule 865–19–85S defines the term at issue, it is clear that in this case a reasonableness standard should be used under either section of the Administrative Procedure Act. *See supra* notes 18–20, 36–37, and accompanying text. *See generally Concerned Parents of Stepchildren v. Mitchell,* 645 P.2d 629, 633 (Utah 1982); *Utah Hotel Co. v. Industrial Comm'n,* 107 Utah 24, 151 P.2d 467, 470 (1944).

**63.** *Pabst Brewing Co. v. City of Milwaukee,* 125 Wis.2d 437, 373 N.W.2d 680, 687–89 (Ct.App. 1985); *Ladish Malting Co. v. Wisconsin Dep't of Revenue,* 98 Wis.2d 496, 297 N.W.2d 56, 62 (Ct.App.1980).

**64.** *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915, 918 (9th Cir.1974).

**65.** Morton asserts that under the functional analysis the determination of whether property is equipment or real property is made using a three-step approach: first, annexation (how is the property attached?); second, adaptation (what is the function or purpose of the property?); and third, intent (did the owner intend the property to remain tangible personal property permanently attached to real estate, or did the owner intend the property to be real property?).

**66.** *See Thirup,* 508 F.2d at 917; *Pabst Brewing Co.,* 373 N.W.2d at 684; *Ladish Malting Co.,* 297 N.W.2d at 56.

**67.** *See generally Concerned Parents of Stepchildren,* 645 P.2d at 633; *Utah Hotel Co.,* 151 P.2d at 470.

under the statutes Morton cites the tax exemption does not apply to the arguably narrower term of buildings and building structures.[68]

We also note that the case law from other jurisdictions is at best conflicting in this area.[69] There are jurisdictions that have not followed a functional approach in interpreting similar statutes.[70] Furthermore, the jurisdictions that have adopted a functional approach have reached conflicting conclusions.[71] Therefore, even if we held that section 59–12–104(16) contemplates a functional approach in determining whether a structure was equipment or real property, it would not necessarily follow that Morton's facilities would constitute equipment. It was established at the hearing that the functional analysis urged by Morton is often "very nebulous." Indeed, it is entirely possible that the Commission agreed with Morton's approach but disagreed with Morton's conclusion.

Given the language of rule 865–19–85S, the discrepancies between rule 865–19–85S and the statutes Morton cites, and the conflicting case law, the Commission's determination that the shells of Morton's facilities do not constitute equipment is not unreasonable. Therefore, the Commission's determination will not be disturbed.

## III.   SECTION  63–46b–16(4)(h)(iii)

■■■ Morton also claims that it is entitled to relief under section 63–46b–16(4)(h)(iii), which provides for judicial relief when the "agency action is ... contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." Neither Morton nor the Commission has cited any case law relating to section 63–46b–16(4)(h)(iii). Indeed, it appears that there is no Utah case law that follows an approach analogous to the approach set out in this section. Moreover, the legislative history concerning this section is confused and therefore not helpful in interpreting the section.[72] Given these facts, we do not engage in an in-depth analysis of the section.

Morton claims that the Commission, in determining that the shells of its production facilities are real property, took action that was contrary to its prior practice of characterizing similar structures as tangible personal property. This allegation is based on the testimony of Mr. Anderson, an auditor who had formerly worked for the tax Commission who testified that he was aware of various instances where

**68.** *See Thirup,* 508 F.2d at 917; *Pabst Brewing Co.,* 373 N.W.2d at 684; *Ladish Malting Co.,* 297 N.W.2d at 56.

**69.** The Commission cites several cases which define the term "real property." Under these definitions, it is clear that Morton's facilities would qualify as real property. Thus, they would not qualify for an exemption under rule 865–19–85S. *See National Lead Co. v. Borough of Sayerville,* 132 N.J.Super. 30, 331 A.2d 633, 637 (1975); *Strobel v. Northwest G.F. Mut. Ins.,* 152 N.W.2d 794, 796 (N.D.1967); *In re Inglis,* 69 Okla. 64, 169 P. 1083, 1084 (1917); *Sanchez v. Brandt,* 567 S.W.2d 254, 258 (Tex.1978).

**70.** *See Green Circle Growers Inc. v. Lorain County Bd. of Revision,* 35 Ohio St.3d 38, 517 N.E.2d 899, 900 (1988).

**71.** *Compare Thirup,* 508 F.2d at 920 (under functional approach, greenhouse constitutes equipment) *with Busch v. County of Hennepin,* 380 N.W.2d 813, 816 (Minn.1986) (under functional approach greenhouse does not constitute equipment). *See also Crown Coco Inc. v. Com-*

*missioner of Revenue,* 336 N.W.2d 272, 274 (Minn.1983) (metal canopy over gasoline pumps does not constitute equipment).

**72.** The comments of the Utah Administrative Law Advisory Committee state that section 63–46b–16(4)(h)(iii) is patterned after section 5–116(8)(iii) of the MSAPA. *See* Advisory Committee at 15. The comment to section 5–116(8)(iii) provides that section 5–116(8)(iii) is related to section 2–103, which requires agencies to make an index of their final orders and to make this index available for public inspection and copying. Under the MSAPA's scheme, a "party may invoke the indexing and public access requirement of Section 2–102, for the purpose of ascertaining the agency's prior practice, so as to reveal the inconsistency between the challenged agency action and prior agency practice." See MSAPA § 5–116, comments, 15 U.L.A. at 129. Utah, however, has not enacted a provision similar to section 2–102. Due to the conflict between this legislative history and Utah's statutory scheme, legislative history cannot be relied on to a great extent in interpreting section 63–46b–16(4)(h)(iii).

walls, flooring, and roofs of automatic storage facilities and large oil storage tanks were treated as tangible personal property. The Commission, in determining that the facilities in question are real property, did not distinguish the instant case from situations involving automatic storage facilities or oil storage tanks. The question presented, therefore, is whether Mr. Anderson's testimony establishes prior inconsistent agency practice for the purpose of section 63–46b–16(4)(h)(iii). If the testimony establishes prior inconsistent agency practice, Morton would be entitled to relief under this section due to the Commission's failure to provide a "rational basis for the inconsistency."

In approaching this issue, it is important to note the exact nature of the evidence presented at the hearing. Mr. Anderson did not testify that the Commission, in a formal or informal hearing, classified oil storage tanks and automatic storage facilities as tangible personal property. Rather, it is apparent from the record that Mr. Anderson was referring to individual audits.[73] Indeed, he testified that the method used in determining that the tanks and storage facilities were tangible personal property was "not an official guideline." Furthermore, the auditing division did not consistently classify such structures as equipment, but also classified such structures as real property. This inconsistency was due to the fact that there was no well-established policy regarding the classification of these structures.

■ Although there is limited law on point,[74] it is clear that in the absence of an official guideline or a well-established policy, the decisions of auditors do not constitute "agency practice" for the purpose of section 63–46b–16(4)(h)(iii).[75] To hold otherwise would be to bind the Commission by the unappealed decisions of its subordinates. It is the Commission that has been granted authority to administer the tax code.[76] Morton has provided no evidence that the Commission itself has acted contrary to the position it has taken in the instant case. Under Morton's approach, the mere fact that there is conflict within an agency on a particular question would be sufficient to justify judicial relief under section 63–46b–16(4)(h)(iii). Due to the presence of a conflict, no matter how the issue is finally resolved, the decision will be inconsistent with some of the decisions of the agency's lower level employees. In recognizing the Commission's authority to administer the tax code, section 63–46b–16 recognizes the Commission's authority over its own employees. Since Morton failed to establish prior agency practice contrary to the agency's action, the Commission's determination cannot be overturned on the basis of section 63–46b–16(4)(h)(iii).

### IV. SECTION 63–46b–16(4)(h)(iv)

■ Morton's remaining contention is that the Commission's determination that the shells of its production facilities do not constitute equipment is not supported by the record and is therefore arbitrary and capricious. It is argued that for this reason Morton is entitled to relief under section 63–46b–16(4)(h)(iv).[77] However, an analysis of the section is unnecessary because it is clear that the record supports the Commission's determination.

It is argued that because Morton produced a witness who testified that in his opinion the shells of the facilities in question constituted equipment and no other witness contradicted this testimony, the Commission is not free to disagree with this opin-

---

**73.** Although it is not clear, it appears from the record that the classification of these structures as tangible personable property occurred in audits concerning Utah Code Ann. § 59–12–103, not Utah Code Ann. § 59–12–104(16).

**74.** *See supra* note 72 and accompanying text.

**75.** It may be important to note that we are not deciding whether the classification of oil storage tanks and walls, ceilings, and floors of automat-

ic storage facilities as tangible personal property is inconsistent with the classification of shells of Morton's facilities as real property.

**76.** *See generally* Utah Code Ann. §§ 59–1–201 to –210.

**77.** Section 63–46b–16(4)(h)(iv) provides for judicial relief when an agency's actions are "otherwise arbitrary or capricious."

ion. Morton's witness formed his opinion by applying his interpretation of rule 865–19–85S and section 59–12–104(16) to the undisputed facts. Since the facts are indeed undisputed, his opinion is simply a legal conclusion. While the Commission is not free to make findings of fact outside the scope of the evidence presented at the hearing,[78] the Commission is free to disagree with the legal conclusions offered by witnesses, even when those conclusions are uncontroverted. It is undisputed that sufficient factual evidence was presented at the hearing, and it has been established that the Commission did not abuse its discretion in dealing with section 59–12–104(16). The Commission's decision, therefore, is supported by the record.

For the reasons stated above, we hold that the Commission did not err in determining that expenditures made in the construction of Morton's sodium azide pellets facilities do not qualify for an exemption under section 59–12–104(15) and (16).

Affirmed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., concurs in the result.

---

**78.** *First Nat'l Bank of Boston v. County Bd. of* *Equalization,* 799 P.2d 1163, 1166 (Utah 1990).