NIEDERHAUSER ORNAMENTAL
& METAL WORKS CO., INC.,
Petitioner,

v.

TAX COMMISSION, AUDITING
DIVISION, State of Utah,
Respondent.

No. 920338–CA.

Court of Appeals of Utah.

Aug. 13, 1993.

Leland S. McCullough, Craig F. McCullough, and John B. Lindsay, Salt Lake City, for petitioner

Jan Graham and John C. McCarrey, Salt Lake City, for respondent.

Before GARFF, GREENWOOD and ORME, JJ.

ORME, Judge:

Petitioner, a metal products fabricator, seeks reversal of the Tax Commission's levy of sales taxes for its purchases in Utah of materials from Utah vendors. Petitioner claims that (1) it was not the ultimate consumer of goods in one instance, (2) some transactions are exempt as sales to religious institutions, and (3) it should receive credit for taxes imposed by Nevada. We affirm.

## FACTS

Petitioner entered into six contracts to fabricate miscellaneous structural steel items, such as staircases and railings, for installation into buildings being constructed outside Utah. Two of the contracts involved work on temples for the Church of Jesus Christ of Latter-day Saints (the LDS Church). General contractors engaged petitioner to fabricate and install steel items for the temples. Although contractually responsible to the general contractors for installation, petitioner subcontracted the installation work to other companies.

The other four contracts involved similar steel and iron work on buildings in Nevada.[1] Three of the four contracts were similar to the ones for the temples: petitioner contracted to fabricate and install items, but subcontracted the actual installation to other companies. One of the four contracts, however, was different. For that Nevada contract, petitioner entered into a joint venture whereby, according to the testimony of petitioner's president, petitioner's co-venturer was responsible for structural steel work and petitioner was responsible for miscellaneous steel work. Like all five other contracts, petitioner did not install any items. Unlike the other contracts, petitioner's co-venturer, rather than a subcontractor, performed the actual installation. Despite testimony from petitioner's president that the co-venturer was obligated to install all the steel, the contract for the project was between the general contractor and petitioner, and contained only their signatures. Nowhere in the general contractor's standard subcontract, which embodied the agreement at issue, was any reference made to the joint venture.[2] Thus, as with each of the other contracts, petitioner was ultimately responsible for installing the steel.[3]

---

1. One of the LDS temples was actually located in Nevada. However, a clear conceptual distinction exists between petitioner's arguments concerning the taxes related to the two LDS temples—one in Oregon and one in Nevada—and those assessed in connection with the other four Nevada projects. Thus, for simplicity, when referring to the four Nevada contracts or projects throughout this opinion, we are referring only to the four contracts involving secular buildings.

2. The record does, however, contain a memorandum of intent from the general contractor to enter into a subcontract with the "Stott/Niederhauser Joint Venture." Nonetheless, the general contractor's standard subcontract for the steel fabrication expressly stated the agreement was "between MARDIAN CONSTRUCTION COMPANY, a Corporation, (hereinafter called the "CONTRACTOR"), and NIEDERHAUSER ORNAMENTAL & METAL WORKS COMPANY, INC., a Corporation, (hereinafter called the "SUBCONTRACTOR")."

3. The following exchange occurred during testimony by petitioner's president, Mr. Niederhauser, in connection with the contracts where peti-

The transactions in controversy are petitioner's purchases of materials in Utah. The materials for all six projects were purchased in Utah from Utah vendors and assimilated, in Utah, into the fabricated products, which were subsequently installed in out-of-state buildings. The petitioner paid Nevada sales tax on the finished products sold for use in the four Nevada projects.

On July 26, 1990, the Auditing Division of the Utah State Tax Commission, after conducting an audit for the period of October 1, 1986, through September 31, 1989, notified petitioner that it owed sales tax on the materials purchased in Utah. After petitioner requested a redetermination, the Tax Commission held a formal hearing on May 1, 1991, and affirmed the initial determination. Petitioner contests the Commission's decision on these grounds: First, purchases made for the joint venture contract are exempt because petitioner was not obligated to install the fabricated products and therefore was not the ultimate consumer of the products purchased in Utah; second, under Utah Code Ann. § 59-12-104(8) (1992), which exempts sales made to or by religious organizations, its purchases of materials used in performing the LDS temple contracts are exempt from sales tax; and third, under Utah Code Ann. § 59-12-104(28) (1992), petitioner is entitled to a credit for taxes paid to Nevada by reason of the four Nevada contracts. Because the taxes in dispute arose between October 1, 1986, and September 31, 1989, the laws in effect at that time govern this case.[4] *Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303, 306 (Utah 1992).

tioner hired subcontractors to perform the installation:

> THE HEARING OFFICER: And—and you entered into an agreement with [the general contractor] to—and by the terms of the contract, anyway, to furnish and install certain steel—
> [MR. NIEDERHAUSER]: That's right.
> ....
> THE HEARING OFFICER: So, if—if the installation wasn't performed correctly, the general would go after you and then you would go after whomever it was that you contracted with to do that installation; isn't that correct?

## STANDARD OF REVIEW

Because this proceeding was commenced after January 1, 1988, the standards of review outlined in the Utah Administrative Procedures Act (UAPA) apply. Utah Code Ann. § 63–46b–16(4) (1989). *See Morton Int'l, Inc. v. State Tax Comm'n,* 814 P.2d 581, 583–89 (Utah 1991). Under UAPA, three standards of review are applicable to agency decisions, depending on the basis for the challenge to such decisions. *Id.*

■ Appellate courts affirm an agency's findings of fact "only if they are 'supported by substantial evidence when viewed in light of the whole record before the court.'" *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 67 (Utah App.1989) (quoting Utah Code Ann. § 63–46b–16(4)(g) (1988)). In contrast to the deferential substantial-evidence test, we apply the least deferential correction-of-error standard when reviewing questions of general statutory interpretation. Utah Code Ann. § 63–46b–16(4)(d) (1989); *King v. Industrial Comm'n,* 850 P.2d 1281, 1285–86 (Utah App.1993). Thus, an appellate court grants no deference to an agency's interpretation of a statute when the court is in as good a position as the agency to interpret the general statutory provision in question, *Morton,* 814 P.2d at 587–88, or "when a legislative intent concerning the specific question at issue can be derived through traditional methods of statutory construction." *Id.* at 589.

■ Between the substantial-evidence and the correction-of-error standards lies an intermediate standard of review.

> [MR. NIEDERHAUSER]: That's the general idea, what we intend to, yeah.
> THE HEARING OFFICER: But ultimately under the terms of the contract, were you liable or obligated to make sure that installation was done?
> [MR. NIEDERHAUSER]: Well, I suppose we were, in a sense, yeah.

**4.** For the reader's convenience, we nonetheless cite to the 1992 codification of the tax statutes, which have not been amended in any material respect insofar as pertinent to this case.

Where the Legislature has either explicitly or implicitly granted discretion to the agency with respect to a particular question, appellate courts review the agency's decision "under [UAPA] section 63–46b–16(4)(h)(i) for abuse of discretion." *King*, 850 P.2d at 1291. *See also SEMECO Indus., Inc. v. State Tax Comm'n*, 849 P.2d 1167, 1171–72 (Utah 1993) (Durham, J., dissenting); *Nucor Corp. v. State Tax Comm'n*, 832 P.2d 1294, 1296–97 (Utah 1992); *Morton*, 814 P.2d at 587. In applying the abuse-of-discretion standard to agency decisions, an appellate court "will not disturb the agency's interpretation or application of the law unless its determination exceeds the bounds of reasonableness and rationality." *King*, 850 P.2d at 1286.

Petitioner does not challenge the Commission's findings of fact, but instead challenges its legal conclusions in applying the relevant statutes to the facts of the case. Accordingly, for each issue before us, we must theoretically choose between the correction-of-error and abuse-of-discretion standards; the former applies if no statutory grant of discretion exists, and the latter if an implicit or explicit grant of statutory discretion can be discerned. *SEMECO*, 849 P.2d at 1171–72 (Durham, J., dissenting); *Morton*, 814 P.2d at 587–89; *King*, 850 P.2d at 1285–88.

Discerning an implied or explicit grant of discretion from the governing statute is key to choosing between these two standards, but it has become an increasingly complex endeavor. *See, e.g., SEMECO*, 849 P.2d at 1170–75 (Durham, J., dissenting); *Morton*, 814 P.2d at 583–89; *Employers' Reinsurance Fund v. Industrial Comm'n*, 856 P.2d 648, 650–51 (Utah App. 1993); *King*, 850 P.2d at 1284–92 (explain-ing that *Morton*'s directive to assess implied grants of discretion under UAPA "has led this court to expend significant judicial resources on ascertaining the appropriate standard of review in appeals from executive agency decisions"); *Bhatia v. Department of Employment Sec.*, 834 P.2d 574, 581–82 (Utah App.1992) (Bench, J., concurring) (noting that analytical framework of *Morton* is complex, and courts "do not have the judicial resources to test all the possible rules of statutory construction in each case before concluding that there is an implicit grant of discretion"). Neither party has undertaken the effort to isolate any grant of discretion in this case.

Because our conclusions are the same under either standard, we decline to add to the growing body of literature discussing means by which a court can discern grants of discretion. We leave the definitive determination of the appropriate standard of review for each issue to a case where selection of the correct standard will determine the outcome of the substantive issue before the court.[5]

## TAXES ASSESSED ON SALES OF MATERIALS USED IN JOINT VENTURE

■ Utah levies a tax on the "retail sales of tangible personal property made within the state" and on "tangible personal property stored, used, or consumed in this state." Utah Code Ann. § 59–12–103(1)(a), (*l*) (1992). However, property purchased for resale in the same form or as a component of a product to be manufactured is exempt from sales tax. *Id.* § 104(27). The theory behind the latter is that sales tax on the individual components will eventually

---

5. The Utah Supreme Court has ruled that whether a purchaser of personal property in Utah is a real property contractor requires the Commission to exercise its discretion and that appellate courts should defer to the Commission unless its decision is "unreasonable or arbitrary." *Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303, 307 (Utah 1992). Whether the intermediate standard actually applies to the first issue we treat is perhaps in some doubt, however, because the *Chicago Bridge* Court was concerned with pre-UAPA law, which regarded uti-lization of the intermediate standard more as a function of agency expertise than of delegation of discretion. *See, e.g., Taylor v. Utah State Training School*, 775 P.2d 432, 434–35 (Utah App.1989) (pre-UAPA case noting "[t]he more likely it is that agency expertise will assist in resolving an issue, the more deference courts should give to the agency's resolution"). Nonetheless, the *Chicago Bridge* Court cited UAPA section 63–46b–16(4)(h)(i) and *Morton* as direct authority for its conclusion. *Chicago Bridge*, 839 P.2d at 307.

be collected in aggregate when a product is finally sold to the ultimate consumer at retail. *Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303, 306 (Utah 1992).

■ Because sales tax is not levied on real property transfers, a real property contractor—i.e., a contractor who purchases materials and incorporates those materials into real property improvements—is considered the ultimate consumer of the property for purposes of imposing a sales tax. *Id. See also Utah Concrete Prod. Corp. v. State Tax Comm'n*, 125 P.2d 408, 411 (Utah 1942) ("[C]ontractors are consumers ... because they are the last persons in the chain to deal with such products before incorporation into a separate entity and before such products lost their identity as such."); Utah Admin.R. 865–19–58S (A)(1) (1993) ("person who converts the personal property into real property is the consumer of the personal property"). Otherwise, the stream of products incorporated into real property would escape sales tax altogether.

In contemplation of this statutory framework, petitioner argues it was not a real property contractor for purposes of the joint venture. If petitioner was a real property contractor, then petitioner is deemed the ultimate consumer of the materials in question and is consequently liable for the taxes assessed by the Commission.[6]

The Utah Supreme Court recently reviewed a case legally and factually much like the one before us. In *Chicago Bridge*, the petitioner (CBI) fabricated the components of large storage tanks, which, because of their size, it then assembled on the customer's out-of-state site. 839 P.2d at 305. The central issue in *Chicago Bridge* was whether CBI acted as a real property contractor and was consequently liable for sales taxes on the component parts it purchased in Utah from Utah vendors. The Commission held that "CBI was liable for the payment of sales taxes for the purchase of steel materials from Utah vendors

in those instances *where CBI was in fact obligated by a sales contract to install the tanks." Id.* (emphasis added).

The Court refused to focus exclusively on the taxpayer's activity in Utah, which was limited to manufacturing, but rather determined "the nature of the purchaser's resale transactions" to be of critical importance even though those transactions occurred outside Utah. *Id.* at 307–08. Because "CBI's customers intended to purchase fully assembled tanks permanently installed on real estate," *id.* at 308, the Court determined the Commission's decision was reasonable. *Id.* at 307–08. CBI, as a real property contractor, was therefore required to pay taxes on its purchases in Utah.

■ In the present appeal, no one disputes that petitioner was a real property contractor with respect to the five contracts where it was *contractually obligated* to install the fabricated goods, even though it elected to subcontract the job to other companies. The controversy here lies with the joint venture. Without specifically addressing the subtleties of the joint venture arrangement, the Commission held: "Because of the ultimate responsibility of the Petitioner to ensure the installation of the materials in question, the Petitioner functioned as a real property contractor, thus making it liable for payment of the appropriate sales tax due." For the reasons noted below, we agree that this conclusion properly applies to the joint venture arrangement as well as to the other projects.

According to *Chicago Bridge*, we must look to "the nature of the purchaser's resale transactions ... even if they occur outside Utah." 839 P.2d at 307–08. With respect to the joint venture, petitioner argues that it resold the fabricated product to the general contractor in Nevada, who then, in essence, contracted with petitioner's co-venturer for installation. The record is devoid of any evidence of such an

---

6. Petitioner does not deny that it was a real property contractor on the other five projects, where it was contractually responsible for installation but subcontracted the installation work.

arrangement. Indeed, testimony by petitioner's president provided no hint that any resale transaction took place, but instead indicated that the co-venturers simply allocated responsibilities for various tasks between themselves. Although the president referred to an agreement between the co-venturers in his testimony before the Commission, petitioner does not direct our attention to such an agreement in the record. Moreover, during the testimony of petitioner's president, petitioner's lawyer interjected that he had never seen any agreement between the co-venturers.

It is of no consequence to our analysis that the joint venture agreement, assuming it existed, allocated responsibility for installation to petitioner's co-venturer.[7] Despite petitioner's assertions to the contrary, the contract for the fabrication project is explicitly between petitioner and the general contractor. *See supra* note 2. Petitioner entered into a contract to install the steel and was obligated to see to it that the steel was properly installed. If the co-venturer failed to perform the installation, petitioner would still have been obligated to the general contractor to effect installation. In our view then, there is no substantial, relevant difference between the joint venture arrangement and the other five contracts, under which petitioner does not dispute its status as a real property contractor. Accordingly, we affirm the Tax Commission's decision that petitioner was a real property contractor for the contract ostensibly undertaken by the joint venture and therefore liable for the taxes assessed.

## EXEMPTION FOR SALE TO RELIGIOUS ORGANIZATION

■ We next consider petitioner's claim that its purchases in Utah of materials used in making products installed in the two LDS temples qualify for tax exemption as "sales made to or by religious or charitable institutions." Utah Code Ann. § 59–12–104(8) (1992). The Commission ruled that petitioner contracted with the temple project's general contractor, not with the LDS Church. The fact that the church owned the buildings into which the products were installed is not enough to establish a sale to a religious institution, according to the Commission.

Petitioner argues that its purchases should have been exempt under section 104(8) because it passes the cost of any taxes on to the general contractor, who in turn passes them on to the LDS Church, and the incidence of the tax therefore falls on a religious organization. In light of a long-standing Utah decision concerning the analogous situation of a tax exemption for sales to government entities, we disagree with petitioner.

In *Utah Concrete Products Corp. v. State Tax Commission*, 101 Utah 513, 125 P.2d 408 (1942), the plaintiffs contested taxes assessed on their sales of concrete materials "to contractors for use in public highway construction." *Id.* at 409. The plaintiffs based their challenge on the statutory exemption from sales taxes for "all sales ... to the state of Utah, its departments and institutions and the political subdivisions thereof," 1933 Utah Laws ch. 63 § 6,[8] claiming that their sales to contractors for state highway projects were de facto sales to the state. The Utah Supreme Court rejected this argument, reasoning that the plaintiffs looked to the contractors for payment and therefore sold the materials to the contractors, not the state.

---

**7.** To hold petitioner not liable for taxes, based on the agreement between participants in a joint venture, would subvert the statutory framework that ensures the component parts are taxed in sum when tangible personal property is converted into real property. Rather than hiring subcontractors to install construction products, parties would simply create joint ventures, thereby circumventing taxes on the property otherwise due at the time the personal property is incorporated into real property.

**8.** The current version of this provision reads:

> The following sales and uses are exempt from the taxes imposed by this chapter:
> ...
> (2) sales to the state, its institutions, and its political subdivisions.

Utah Code Ann. § 59–12–104 (1992).

In language pertinent to the present case, the Court explained:

> The fact that the burden of the tax is passed by the contractor to the state in the form of higher bids, and in this manner is indirectly paid by the state does not bring plaintiffs under the exemption found in Section 6.

*Utah Concrete*, 125 P.2d at 411.

In a more recent case, a slag processor agreed to provide a contractor with slag for a roadbed on a highway construction project funded by the Utah Department of Transportation (UDOT). *Rocky Mtn. Energy v. State Tax Comm'n*, 852 P.2d 284 (Utah 1993). Although the oral agreement and sale were between the slag processor and highway contractor, all parties, including UDOT, agreed that the processor would receive payment from UDOT rather than the contractor. *Id.* at 284. Relying in part on *Utah Concrete*, the Utah Supreme Court held, despite the agreement concerning payment, that the sale of slag to the contractor was not tax exempt as a sale "to the state, its institutions, [or] its political subdivisions." *Id.* at 61–62 (quoting Utah Code Ann. § 59–12–104(2)). *Cf. Brown Plumbing & Heating Co. v. State Tax Comm'n*, 848 P.2d 181 (Utah App.1993) (commission incorrectly taxed plumbing contractor for purchase where school district directly purchased materials from supplier, thereby transforming agreement with contractor from furnish-and-install to install-only contract).

The *Utah Concrete* reasoning aptly applies to petitioner's claim concerning the sales tax exemption for religious organizations. The fact that the amount of the tax might be passed along to the general contractor and then on to the LDS Church does not bring this transaction under section 104(8). Accordingly, the Commission correctly assessed sales tax on petitioner's purchase of materials for the two temple contracts.

## CREDIT FOR TAXES PAID TO NEVADA

██ Finally, petitioner argues that it is entitled to a credit for taxes paid to Nevada on the property purchased and sold in connection with the four Nevada contracts. Utah Code Ann. § 59–12–104(28) (1992) exempts

> property upon which a sales or use tax was paid to some other state, or one of its subdivisions, except that [Utah] shall be paid any difference between the tax paid and the [sales or use] tax imposed by [Utah or its local governments].

Petitioner contends that because it has paid tax in Nevada on the goods in question, Utah's sales tax on those same goods—or, more accurately, the materials that went into those goods—imposes double taxation that unlawfully discriminates against interstate commerce unless petitioner is given credit against its Utah tax bill for the taxes paid to Nevada.

Such an assertion is largely dispelled by the reasoning used in *Chicago Bridge & Iron Co. v. State Tax Commission*, 839 P.2d 303, 308–09 (Utah 1992). In that case, California imposed a use tax on materials for which petitioner (CBI) had paid sales tax in Utah. *Id.* CBI argued that since California legitimately taxed the tanks upon installation, Utah's imposition of sales tax on the component materials constituted double taxation. *Id.* at 308. After initially deciding that the taxable Utah transactions in that case were simply sales of goods between Utah vendors and CBI and therefore not transactions in interstate commerce, the Utah Supreme Court concluded that CBI was liable for the Utah tax, notwithstanding its prior payment of the California tax. *Id.* at 308–09. Like the transactions reviewed in *Chicago Bridge*, the transactions between petitioner and Utah vendors in the instant case were not transactions in interstate commerce but simply the routine sales of goods within this state.

The *Chicago Bridge* Court grounded its "short answer to CBI's argument," *id.* at 308, largely on the fact that both states in that case were members of the Multistate Tax Commission and accordingly both adopted the Multistate Tax Compact, which reads in relevant part:

ELEMENTS OF SALES AND USE TAX LAWS

Tax Credit

1. Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

Utah Code Ann. § 59–1–801(V)(1) (1992). The *Chicago Bridge* Court concluded the sales tax paid in Utah takes precedence over the use tax imposed by California because "precedence in liability shall prevail over precedence in payment." 839 P.2d at 309 (quoting *Resolution of Multistate Tax Commission* (1980)). In the Court's view, petitioner should have been asking California for a credit against tax in the amount of taxes paid to Utah—not the other way around. We come to the same basic conclusion regarding petitioner in this case.

Although *Chicago Bridge* dealt with determining priority between taxpayers under section 801, Utah's codification of the Multistate Tax Compact, the statutory language instructing which state should credit the taxpayer is similar to that used in section 104(28)—namely, credit is received or exemption is provided for taxes *paid* to the other state. The *Chicago Bridge* Court's conclusion that taxes which come due first take priority over taxes *paid* first is a simple, logical, and easily applied rule that applies equally well to section 104(28). Petitioner was liable for the Utah tax first because the sales of materials to petitioner in Utah occurred long before petitioner sold finished products in Nevada. Accordingly, under the *Chicago Bridge* rule, petitioner should be addressing its claim for a credit to Nevada.

CONCLUSION

Petitioner acted as a real property contractor for all six contracts, including the joint venture project. Its purchases of materials needed to perform contracts to supply and install steel in LDS temples were not exempt. The taxes paid to Nevada came due after sales taxes in Utah and therefore petitioner is not entitled to a credit against Utah sales tax. We accordingly affirm the Tax Commission's decision.

GARFF and GREENWOOD, JJ., concur.