**BROADCAST INTERNATIONAL, INC., Petitioner,**

v.

**UTAH STATE TAX COMMISSION, Respondent.**

**No. 930527–CA.**

Court of Appeals of Utah.

Sept. 30, 1994.

Randy M. Grimshaw and Maxwell A. Miller, Salt Lake City, for petitioner.

Jan Graham and Clark L. Snelson, Salt Lake City, for respondent.

Before GREENWOOD, JACKSON and ORME, JJ.

## OPINION

ORME, Associate Presiding Judge:

This case comes to us on a petition for review of the Utah State Tax Commission's order assessing sales and use tax and imposing a ten percent penalty against Broadcast International, Inc. The Tax Commission's assessment is affirmed in part and remanded in part. The imposition of the penalty is affirmed.

## FACTS

Neither party disputes the material facts. Broadcast is a Utah corporation that provides the services of a private satellite network. Its subscribers are typically large retail businesses such as those operated by American Stores, Fleming Foods, and Safe-

way. Broadcast's services include background music, in-store advertising, electronic mail, video conferencing, stock and commodity quotes, check verification, and credit card services. Each subscriber selects the services it will receive from Broadcast and the content of such services. For example, a subscriber chooses the type of background music it will receive, makes arrangements for its own in-store advertising directly with advertisers, and establishes the time and content of video conferences. Broadcast delivers the selected services over its satellite network, according to the subscriber's instructions.

Broadcast services its subscribers by means of a satellite dish and mount, low noise amplifier, connecting cable, printer, and receiver at each location. If a particular subscriber already has some of the equipment necessary to receive Broadcast's services, such equipment is incorporated into the system installed by Broadcast.

Broadcast's employees or contractors install the required system components at each subscriber's location. The satellite dish is typically mounted on the building's roof and attached to the building's framework. Cables connect the external equipment to the other components, most of which are usually located in a secure office.

Broadcast's services are provided pursuant to "service agreements" negotiated between Broadcast and each subscriber. These contracts specify the types of service the subscriber will receive from Broadcast and their price. Broadcast is bound by its service agreements to provide its services throughout the subscriber's hours of operation.

The contracts contain no recitation that the subscriber is also purchasing equipment. Rather, Broadcast is obligated to furnish, install, and maintain all equipment necessary for delivery of its services. Subscribers are contractually prohibited from moving the equipment, adding equipment, or altering the equipment. The service agreements specifically provide that equipment furnished by Broadcast remains Broadcast's property. Such equipment is labeled as Broadcast's property and also marked with Broadcast's inventory number. The equipment in ques-

tion is carried as an asset on Broadcast's financial records. In addition, subscribers are contractually bound to indemnify Broadcast for damage, destruction, or loss to Broadcast's equipment while it is at the subscriber's location. It is possible for Broadcast to move its equipment from one location to another. However, such relocation has rarely been necessary because subscribers have usually renewed their contracts with Broadcast.

Once Broadcast has installed the equipment, the subscriber communicates any desired changes in service to Broadcast, which then implements those changes from its headquarters in Midvale, Utah. The subscribers cannot make such changes in service themselves. Broadcast's service staff visits each installation as required to maintain the system in good working order, averaging only about one visit per year to each site.

Broadcast purchased the majority of its equipment from out-of-state vendors. Such equipment was shipped directly from the vendors to the installation site. In most cases, such sites were also out of state. The Tax Commission has not assessed Utah sales or use tax on these out-of-state transactions.

However, the Tax Commission did assess sales tax on Broadcast's purchases of equipment from Utah vendors, primarily "Digistar" receivers purchased from CDI Corporation in Orem, Utah. CDI delivered the receivers to Broadcast's Midvale office. They were stored in Utah, then shipped to installation sites typically outside Utah. At first, CDI collected sales tax on its sales of receivers to Broadcast. Later, after Broadcast provided CDI with an exemption certificate stating that it purchased the receivers for resale, CDI stopped collecting sales tax.

From the time it began doing business in 1985 until 1988, Broadcast had no system for reporting and paying sales and use tax on its acquisitions of equipment. Broadcast developed such a system during 1988 and attempted to apply it retroactively to all prior equipment purchases. Under its system, Broadcast treats sales or use tax as being due in the jurisdiction in which the equipment is installed, and as being payable by Broadcast on the amount paid by Broadcast for the equipment. With respect to equipment purchased from out-of-state vendors and used in Utah installations, Broadcast pays use tax to Utah on such equipment as though it is the consumer, i.e., based on the purchase price of the equipment.

In a transaction unrelated to Broadcast's equipment purchases, Broadcast provided a blank master tape to Merrill Osmond Enterprises and allowed Osmond to use Broadcast's facilities to record on the master tape. Osmond produced the tape and duplicated it for retail distribution. Broadcast did not charge sales tax on the transaction, nor did it request an exemption certificate from Osmond until after the Tax Commission's Audit Division began its investigation. Osmond later furnished an exemption certificate, but it was undated and did not contain an exemption number or a sales tax license number.

On August 1, 1991, after comprehensive review of Broadcast's business activities, the Audit Division assessed Broadcast with unpaid sales and use tax in the amount of $241,809.04 for the period of January 1987 to September 1990. It also imposed a ten percent negligence penalty in the amount of $24,180.92 and interest at the statutory rate [1] in the amount of $47,456.09. Broadcast filed a timely appeal of the Audit Division's assessment with the Tax Commission, claiming it was wrongfully denied its request for sales and use tax exemptions for its purchases of equipment.

### TAX COMMISSION'S RULINGS

#### A. Sales and Use Tax

Following a formal hearing, the Tax Commission affirmed the Audit Division's assessment and denied Broadcast's appeal. The Tax Commission first concluded that the equipment purchased and stored in Utah was not purchased or stored for resale, and therefore was subject to taxation. Second, the Tax Commission concluded that Broadcast, a Utah corporation, did not engage in transactions considered exempt as part of interstate commerce insofar as it purchased,

---

1. *See* Utah Code Ann. §§ 59–1–402, 59–10–537     (1992).

stored, and took delivery of equipment in Utah. The Tax Commission further held that Broadcast was not entitled to claim a credit for taxes paid to other jurisdictions. The Tax Commission ruled that because the first taxable event occurred in Utah, Utah tax liability preceded any tax liability imposed by other jurisdictions.

To summarize, the Tax Commission held Broadcast liable for sales or use tax on equipment purchased from Utah vendors, or purchased from out-of-state vendors and stored in Utah, and denied Broadcast credit for sales or use taxes paid to other jurisdictions.

### B. The Osmond Transaction

The second issue before the Tax Commission concerned the imposition of tax on Broadcast's sale of a master recording tape to Osmond. The Tax Commission found that Broadcast provided both the blank master tape and the recording facilities from which the recorded master tape was produced. The Tax Commission concluded that Broadcast's sale of the recorded master tape to Osmond constituted a sale of tangible personal property subject to sales and use tax. In so holding, the Tax Commission noted that Osmond's inaccurate and incomplete exemption certificate, obtained by Broadcast after the Audit Division had begun its investigation, was insufficient to insulate Broadcast from tax liability.

### C. Penalty

The Tax Commission also affirmed the Audit Division's decision to add a ten percent negligence penalty to Broadcast's tax bill. The Audit Division imposed the negligence penalty on the grounds that Broadcast failed to organize and conduct its business with reasonable prudence so as to provide for proper payment of taxes and had improperly used a resale exemption certificate in its dealings with CDI. In affirming the imposition of the penalty, the Tax Commission noted "Broadcast's inattention to its sales and

use tax liability during the initial portion of the audit period, its adoption of inconsistent positions with respect to its Utah and out-of-state installations, and its neglect of sales and use liability on the Osmond transaction."

### ISSUES ON APPEAL

The primary issues on appeal are whether the Tax Commission erred (1) in determining that Broadcast did not purchase or store its equipment for the purpose of resale, and that the equipment was therefore not exempt from sales and use tax; (2) in denying Broadcast credit for use taxes paid to jurisdictions other than Utah; (3) in concluding that the exemption certificate obtained by Broadcast in the Osmond transaction was flawed, that the transaction constituted a sale of tangible personal property, and, therefore, that the recorded master tape was subject to sales tax; and (4) in determining that a ten percent negligence penalty was appropriately added to Broadcast's overall tax liability.

### TAXES ASSESSED ON EQUIPMENT PURCHASED IN UTAH

Utah imposes a tax on "the retail sales of tangible personal property made within the state." Utah Code Ann. § 59–12–103(1)(a) (1992).[2] However, property purchased for resale is exempt from sales tax. *Id.* § 59–12–104(27). The rationale behind the "purchased for resale" exemption is that the sales tax burden is intended to fall on the product's ultimate consumer, and the state will collect sales tax when the product is sold at retail. *See Chicago Bridge & Iron Co. v. State Tax Comm'n,* 839 P.2d 303, 306 (Utah 1992); *Nucor Corp. v. State Tax Comm'n,* 832 P.2d 1294, 1297 (Utah 1992); *Niederhauser Ornamental & Metal Works Co. v. State Tax Comm'n,* 858 P.2d 1034, 1037–38 (Utah App.), *cert. denied,* 870 P.2d 957 (Utah 1993).

Broadcast does not challenge the Tax Commission's factual findings and freely concedes that it purchased equipment from Utah vendors. Broadcast argues, however, that

**2.** As indicated, the taxes and related penalty arose between January 1, 1987, and September 30, 1990, and therefore the laws in effect at that time control the resolution of this case. For the reader's convenience, however, we cite to the most recent codification of the tax statutes, which remain essentially unchanged insofar as relevant to this case.

the equipment was purchased for resale and is therefore not subject to sales tax. Broadcast challenges the Tax Commission's interpretation and application of the controlling tax statutes. "[A]n appellate court grants no deference to an agency's interpretation of a statute when the court is in as good a position as the agency to interpret the general statutory provision in question."[3] *Niederhauser*, 858 P.2d at 1036.

■ Since Broadcast is the party claiming an exemption, it has the burden of proving it qualifies for the exemption. *See Nucor*, 832 P.2d at 1297; *Parson Asphalt Prods., Inc. v. State Tax Comm'n*, 617 P.2d 397, 398 (Utah 1980) ("Statutes which provide for exemptions should be strictly construed, and one who so claims has the burden of showing his entitlement to the exemption."). Broadcast's claim for exemption is based on Utah Code Ann. § 59–12–104(27) (1992), which exempts property purchased for resale from taxation. However, the Utah Sales and Use Tax Act does not specifically define the term "purchased for resale" found in section 104(27). The Utah Supreme Court has, however, interpreted the phrase "purchased for resale" in *Nucor Corp. v. State Tax Comm'n*, 832 P.2d 1294, 1296 n. 5 (Utah 1992). In *Nucor*, the principle issue was whether the taxpayer was entitled to a purchased-for-resale exemption for ingredients it purchased and used in manufacturing products it later sold. *Id.* at 1296. The Utah Supreme Court stated that "[t]he plain meaning of the words 'purchased for resale' implies that a company's purpose in buying an item must be to resell that item." *Id.* at 1296 n. 5.

· Accordingly, the Utah Supreme Court upheld the Tax Commission's decision which "determined that Nucor purchased items at issue primarily for their use as equipment and only incidently for their use as ingredients in the manufacturing process." *Id.* at 1297. In reaching its decision, the Court noted that "[t]he determination of a purchaser's status as a consumer subject to tax or as a wholesaler or manufacturer exempt from taxation depended on the purchaser's use of the item in question and the reason for its purchase." *Id. See Union Portland Cement Co. v. State Tax Comm'n*, 110 Utah 135, 170 P.2d 164, 171 (1946), *rev'd on other grounds*, 110 Utah 152, 176 P.2d 879 (1947).[4]

In the case before us, Broadcast claims it should be classified as a wholesaler, or one who resells the equipment, rather than one who has purchased it for its own use and ultimate consumption. The record does not support such a claim. Instead, the record supports the Tax Commission's finding that Broadcast never intended to resell the equipment. For example, Broadcast wrote a letter to numerous other taxing jurisdictions stating that "[a]ll equipment installed by Broadcast International remains our property and is not sold, leased or rented to the retail stores to which we provide our service." Also in the record is testimony from Broadcast's officers expressly stating that Broadcast did not intend to resell its equipment and never actually had sold its equipment. Rather, it was Broadcast's intent to provide services to its subscribers and Broadcast used the equipment—its equip-

**3.** The Tax Commission contends the Legislature has granted it discretion, either implicitly or explicitly, to interpret and apply the controlling statutes, and therefore we must review its decision under an abuse of discretion standard. *See* Utah Code Ann. § 63–46b–16(4)(h)(i) (1989); *Niederhauser Ornamental & Metal Works Co. v. State Tax Comm'n*, 858 P.2d 1034, 1036–37 (Utah App.), *cert. denied*, 870 P.2d 957 (Utah 1993). Determining whether the governing statutes impart an implied or explicit grant of discretion to the agency "has become an increasingly complex endeavor." *Niederhauser*, 858 P.2d at 1037. In this case, the choice between the correction-of-error and the abuse-of-discretion standards does not affect the outcome. Therefore, we need not definitively determine the appropriate standard of review. *See id.*

**4.** The *Nucor* Court applied the logic of the *Union Portland* case to define the purchased-for-resale exemption. The Court stated: "We inherently recognized in our decision that Union Portland's primary intent in purchasing the items was to use them as manufacturing equipment, not as raw ingredients for cement." *Nucor Corp. v. State Tax Comm'n*, 832 P.2d 1294, 1297 (Utah 1992). Thus, the Court, in both *Nucor* and *Union Portland*, recognized that the important factor in applying the purchased-for-resale exemption was the primary purpose of the purchase, not who eventually ended up with the items. *See id.*

ment—as a necessary tool in providing those services.

Nonetheless, Broadcast claims we should focus on the definition of "sale" found in section 59–12–102(10) to interpret and apply the purchased-for-resale exemption. That section defines "sale" in these terms:

> "Sale" means any transfer of title, exchange, or barter, conditional or otherwise, in any manner, of tangible personal property or any other taxable item or service under Subsection 59–12–103(1), for a consideration. It includes:
>
> . . . .
>
> (e) any transaction under which right to possession, operation, or use of any article of tangible personal property is granted under a lease or contract and the transfer of possession would be taxable if an outright sale were made.

Utah Code Ann. § 59–12–102(10) (1992). Broadcast argues it purchased the equipment for resale because it transferred the "right to possession, operation, [and] use" of its equipment by contract to its subscribers and such transfer of possession would have been taxable had actual transfer of title occurred.

While Broadcast's use of the definition of "sale" to construe the term "resale" seems plausible, we must point out that satisfying the definition of "sale" is not the end of the inquiry, even if Broadcast is correct that a "resale" is nothing more than another "sale." What makes a transaction taxable is section 59–12–103(1)(a), which assesses sales tax on any *retail* sale. Likewise, what makes a transaction exempt is section 59–12–104(27), which exempts "property purchased for resale in this state." Therefore, determining what constitutes a taxable sale requires consideration of the interplay between the sub-

stantive provisions of section 59–12–103(1)(a) and section 59–12–104(27), for which focusing on a definitional provision, in isolation, is simply no substitute.[5]

■ A two-part analysis is used in determining whether a taxable retail sale has occurred. *See BJ–Titan Servs. v. State Tax Comm'n*, 842 P.2d 822, 825–28 (Utah 1992). First, we must determine whether the essence of the transaction is an exchange for services or for tangible personal property, because the sale of services is generally not taxable. *See id.* at 825. However, such a determination depends on whether the services provided are incidental to the personal property that is at the heart of the transaction, or whether the personal property is incidental to the services for which the parties bargained. *See id.*

■ If we determine that the transaction is predominantly for services, but still conclude that property has been used in providing those services, then we must determine "who is the ultimate 'user or consumer' of the tangible personal property." *See id.* This is because sales tax is typically levied on the ultimate consumer or end-user of the property, not an intermediate purchaser, such as a wholesaler, who buys only to resell, or a manufacturer, who simply incorporates the property into its product. *See id. See also* Utah Code Ann. § 59–12–104(27) (1992). In such cases, sales tax attributable to the component part is paid when the wholesaler's or manufacturer's final product is sold. *See id. BJ–Titan*, 842 P.2d at 825. However, if the property is consumed in providing the service, and is not separately invoiced, as in the case of a dentist's use of materials in fixing a patient's teeth, then the service provider is the ultimate consumer and is liable for the sales tax.[6] *See Hardy v. State Tax Comm'n*, 561 P.2d 1064, 1065 (Utah 1977).

---

5. Utah Code Ann. § 59–12–102 (1992) defines specific terms found within the operative sections of the tax statutes. We do not construe statutes "in a piecemeal fashion, but as a comprehensive whole." *Belnorth Petroleum Corp. v. State Tax Comm'n*, 845 P.2d 266, 269 n. 6 (Utah App.), *cert. denied*, 859 P.2d 585 (Utah 1993). *See also Osuala v. Aetna Life & Casualty Co.*, 608 P.2d 242, 243 (Utah 1980) ("If there is doubt or uncertainty as to the meaning or application of the provisions of an act, it is appropriate to analyze the act in its entirety, in light of its objective, and to harmonize its provisions in ac-

cordance with the legislative intent and purpose.").

6. Compare the dentist's purchase and use of materials with a mechanic's purchase and use of auto parts. Unlike the dentist, who is taxed on materials used to fix teeth, an auto mechanic is not taxed on parts he or she purchases to fix a customer's vehicle. *See BJ–Titan*, 842 P.2d at 827. The customer, not the mechanic, is the ultimate consumer of auto parts because the transaction is easily severable into two distinct transactions—one for the sale of parts and one

■ In the case before us, the essence of the transaction was the sale of services. Subscribers paid Broadcast for access to the satellite network and related benefits, not to buy equipment. Nor did they pay for the right to possess or use equipment. Broadcast all but concedes that the receivers purchased from CDI Corporation are merely incidental tools necessary for providing its services to its subscribers. Thus, Broadcast provided a service for which sales tax could not be assessed against its subscribers.

■ Yet the equipment is being consumed through its use, either by Broadcast or by its subscribers. In order to avoid tax liability, Broadcast argues that because it transferred use or possession of the equipment to its subscribers, the subscribers are the end-users or ultimate consumers. However, as previously noted, Broadcast only transfers use or possession incident to providing a service to the subscribers, and only for the length of the service. There is no permanent transfer of use or possession. Broadcast's customers do not buy the receivers; rather the receivers are used by Broadcast to provide a service, which service is purchased by its customers.

In contrast to Broadcast's argument that it "resold" the receivers to its subscribers, making it exempt from tax liability, the facts clearly show that the receivers remained Broadcast's property. Broadcast's own representatives testified that it never sold or even leased its equipment to its subscribers. Broadcast's service agreements also state that they are not to be construed as a sale or lease of the equipment "in any manner." Further, Broadcast lists the equipment as an asset on its corporate balance sheet, and takes depreciation deductions on it. If a lease is not renewed upon expiration, Broadcast retrieves the equipment it has installed and reinstalls it at another subscriber's location; the subscriber has no say in the equipment's ultimate disposition. Finally, Broad-

cast made no attempt to collect sales tax on the equipment it claims it "resold" to its subscribers. In fact, the agreements specifically provide that Broadcast will be liable for any sales and use tax assessed on the equipment.

These facts more than adequately support the Tax Commission's findings that Broadcast purchases equipment, uses it in providing services to its customers, takes the tax benefits of owning the equipment, and makes the determination as to the ultimate disposition of the property. Contrary to Broadcast's suggestion, the fact that its subscribers enjoy physical possession of the equipment during the contract term is not a critical factor in determining who is the ultimate consumer for purposes of tax liability. See Thorup Bros. Constr., Inc. v. State Tax Comm'n, 860 P.2d 324, 328–29 (Utah 1993) (construction company not ultimate consumer even though it had physical possession and use of building materials).

Accordingly, we affirm the Tax Commission's conclusion that Broadcast is the ultimate consumer of the equipment, and therefore subject to sales tax on its purchase.

## USE TAX ASSESSED ON EQUIPMENT STORED IN UTAH

The Tax Commission found Broadcast liable for use tax on some of its equipment. Specifically, the Tax Commission found that equipment which Broadcast bought from out-of-state suppliers and stored in Utah prior to its installation was subject to use tax in Utah. "Use taxes are imposed on the storage, use, or consumption of tangible personal property purchased outside the state for storage, use, or consumption in Utah." Chicago Bridge & Iron Co. v. State Tax Comm'n, 839 P.2d 303, 306 (Utah 1992). See Utah Code Ann. § 59–12–103(1)(l) (1992).

Broadcast does not dispute that it did not pay tax on equipment purchased from out-of-state vendors and stored in Utah; rather, it repeats its claim that it is exempt from use

for the labor necessary to install the parts. See id. The same cannot be said for a dentist's contract to fill a cavity, which is clearly a service transaction even though some materials are inci-

dentally used in providing the service. See Hardy v. State Tax Comm'n, 561 P.2d 1064, 1065 (Utah 1977).

tax because it purchased the equipment for resale. *See* Utah Code Ann. § 59–12–104(25) (1992). Because we addressed whether Broadcast purchased the equipment for resale in the preceding section, we need not repeat the discussion here. The Tax Commission's imposition of use tax on Broadcast for storing certain receivers and other equipment in Utah was correct and is affirmed.

## CREDIT FOR TAXES PAID TO OTHER JURISDICTIONS

Broadcast contends the Multistate Tax Compact, as adopted and codified in Utah Code Ann. § 59–1–801 (1992), entitles it to a credit for taxes it paid to other jurisdictions.[7] This section provides, in part, as follows:

> Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

*Id.* § 59–1–801(V)(1). In addition, Broadcast argues the language of Utah Code Ann. § 59–12–104(28) (1992) provides a credit for taxes paid to another state. That section provides an exemption from sales and use tax for "property upon which a sales or use tax was paid to some other state, or one of its subdivisions." *Id.*

In *Chicago Bridge & Iron Co. v. State Tax Commission*, 839 P.2d 303 (Utah 1992), the petitioner argued the Tax Commission erred by not offsetting its Utah tax liability by the amount of use tax it previously paid to California. *Id.* at 308. However, the Utah Supreme Court upheld the Tax Commission's assessment, reasoning that sales tax imposed by Utah has priority over use tax paid in California because " 'precedence in liability

shall prevail over precedence in payment.' " *Id.* at 309 (quoting *Resolution of Multistate Tax Commission* (1980)). *See also Niederhauser Ornamental & Metal Works Co. v. State Tax Comm'n*, 858 P.2d 1034, 1040–41 (Utah App.) (denying credit for sales tax paid to Nevada where sales tax first came due in Utah), *cert. denied*, 870 P.2d 957 (Utah 1993). Like the petitioners in *Chicago Bridge* and *Niederhauser*, Broadcast should be seeking credit from the other jurisdictions for the amount of its tax liability in Utah. We see no reason to abandon the well-reasoned and easily applied rule established in *Chicago Bridge* and followed in *Niederhauser*, namely that "taxes which come due first take priority over taxes *paid* first." *Niederhauser*, 858 P.2d at 1041 (emphasis in original).

■ Broadcast was liable for the Utah tax first because it necessarily purchased or stored the subject equipment in Utah well before selling its satellite services in other jurisdictions, incident to which it installed that equipment. Accordingly, Broadcast should address any claim for tax credit to these other jurisdictions.

## THE OSMOND TRANSACTION

The Tax Commission also determined that, for a fee not specified in its findings, Broadcast provided Merrill Osmond Enterprises with a blank tape and the use of its recording facilities from which Osmond produced a master tape. At a separate facility, Osmond used the master tape to mass produce cassette tapes which it sold to its retail customers. Based on these findings, the Tax Commission ruled that Broadcast sold a master tape to Osmond, and that this transaction was a sale of tangible personal property subject to tax under Utah Code Ann. § 59–12–103(1) (1992). Broadcast disputes the Tax Commission's findings and maintains its transaction with Osmond was not taxable because it did not sell a master tape, but

---

7. Broadcast further contends that failure to provide such a credit would result in double taxation in violation of the Commerce Clause. The Utah Supreme Court has already decided this issue against Broadcast's position. *See Chicago Bridge & Iron Co. v. State Tax Comm'n*, 839 P.2d 303,

308–09 (Utah 1992) (holding Utah's taxation of purchases of personal property from Utah vendors does not violate Commerce Clause despite prior improvident payment of use tax in another jurisdiction).

merely leased its recording facilities to Osmond, who produced the master tape.

Unfortunately, the Tax Commission's findings, while commendably detailed as concerns the other issues, are inadequate for us to determine the factual basis for taxing the sale of the master tape. The findings do not adequately specify the value of the blank tape or the amount paid by Osmond. The findings do not allow us to review whether a tax was assessed based only on the price of the blank master tape or whether the tax was based on the combined value of the blank master tape plus the recording studio services. Without this information the Tax Commission's findings are inadequate, and we can only remand for further findings. *See Nelson v. State Tax Comm'n,* 29 Utah 2d 162, 506 P.2d 437, 439–40 (1973) (interests of justice not served by resolving merits of controversy based on inadequate findings).

■ Given the state of the findings, we cannot tell which of at least two possible outcomes is the proper one. The first such outcome is that the Tax Commission erred in assessing a tax against Broadcast for the sale of the completed master tape because it included in that assessment the value of the dominant service component of the transaction. The nature of the transaction appears to have been a sale of services, and not a sale of tangible personal property. The essence of the bargain apparently was the use of Broadcast's equipment and studio to develop a master tape, which Osmond then used to produce cassette tapes for sale to its retail customers. Under these circumstances, the blank tape that Broadcast provided was merely incidental to providing the technology and equipment necessary to creating a master tape. If the tape was incidental to the services for which the parties bargained, then the transaction as a whole was not taxable as a sale of tangible personal property.[8] *See BJ–Titan Servs. v. State Tax Comm'n,* 842 P.2d 822, 825 (Utah 1992).

■ A second outcome, with a different tax consequence, is, however, possible given the inadequate findings. Perhaps, in essence, Broadcast sold Osmond a recorded master tape for a certain sum. This would suggest that the finished tape was the consideration for which Osmond bargained, not the use of the recording facilities. The essence of such a transaction would be the sale of the tape and not the sale of a service. Given this circumstance, the sale of the recorded master tape itself would be taxable as the sale of tangible personal property.

We do not know whether the Tax Commission assessed Broadcast with the correct amount of tax because the Tax Commission, in its findings, did not separate Broadcast's tax liability based on the Osmond transaction from its overall tax liability stemming from unpaid taxes on the equipment it used in providing its satellite services. We therefore remand this matter for the entry of adequate findings and further explanation of the basis for imposing tax liability on Broadcast by reason of the Osmond transaction.

## PENALTY

Broadcast asserts that the Tax Commission erred in imposing a ten percent penalty pursuant to Utah Code Ann. § 59–1–401(3)(a) (1992). That provision states: "If any underpayment of taxes is due to negligence, the penalty is 10% of the underpayment." *Id.* As previously noted, the Tax Commission upheld imposition of a ten percent negligence penalty based on "Broadcast's inattention to its sales and use tax liability during the initial portion of the audit period, its adoption of inconsistent positions with respect to its Utah and out-of-state installations, and its neglect of sales and use liability on the Osmond transaction."

■ The ten percent negligence penalty is appropriate "when the taxpayer has failed to pay taxes and a reasonable investigation into the applicable rules and statutes would have revealed that the taxes were due." *Hales Sand & Gravel, Inc. v. State Tax Comm'n,* 842 P.2d 887, 895 (Utah 1992).

8. In such a scenario, a sales tax could properly be assessed on the price of the blank tape as distinct from the value of using the studio. *See* note 6 and accompanying text.

"[T]he taxpayer can escape the penalty if he or she can show that he or she based the nonpayment of taxes on a legitimate, good faith interpretation of an arguable point of law." *Id.*

■■■■ With this principle in mind, Broadcast calls our attention to its reliance on the definition of "sale," *see* Utah Code Ann. § 59–12–102(10) (1992), which we characterized as plausible. However, Broadcast's effort to escape the negligence penalty is not aided by its belated reliance on the definition. It is clear that counsel developed this rationalization after the fact in preparing their legal arguments. There is absolutely no indication that Broadcast had this definition in mind as the basis for a carefully considered decision that no tax was owed in Utah.[9]

In fact, the record shows just the opposite. For example, Broadcast paid use tax on equipment it used in jurisdictions outside of Utah. If Broadcast believed it had purchased the equipment for resale, as it now claims, it would not have paid use tax on the equipment since sales tax liability would fall upon the subscribers, as the ultimate consumers. In addition, Broadcast informed other taxing jurisdictions that it in no way sold or leased the equipment to its subscribers. Had Broadcast believed its transactions with its subscribers constituted sales of tangible personal property, it would not have told the taxing jurisdictions otherwise.

Moreover, Broadcast's Utah sales tax returns did not reflect equipment sales to its in-state subscribers. Broadcast did not collect sales tax on its transactions for the transfer of the right to use, operate, or possess the equipment. If Broadcast had a good

faith belief that it sold the equipment to Utah subscribers, it would have treated the transactions as such on its Utah sales tax returns. Also, Broadcast did not record its equipment purchases in a manner consistent with its theory that it resold the equipment to its subscribers. Broadcast did not carry its purchases in an inventory account, but rather recorded the purchases in a general asset account. Finally, Steven Webb, Broadcast's controller during the audit period, stated that Broadcast's decisions concerning tax liability were made not on whether the transaction was a "sale" but rather based on "where the equipment was being used."

Therefore, we hold that the ten percent negligence penalty is appropriate because at the time it withheld payment of taxes, Broadcast did not base its nonpayment "on a legitimate, good faith interpretation of an arguable point of law." Accordingly, we affirm the imposition of a ten percent negligence penalty against Broadcast.[10]

## CONCLUSION

Broadcast is subject to sales tax for equipment purchased in Utah and use tax for equipment purchased from out-of-state vendors and temporarily stored in Utah. The equipment at issue was not purchased for resale and, therefore, was not exempt from sales tax. The Tax Commission correctly denied Broadcast credit for taxes paid to other jurisdictions because Broadcast's tax liability first arose in Utah. Finally, Broadcast's failure to pay these taxes was not due to a good faith belief that the items in question were purchased for resale or were otherwise exempt.

**9.** We note that if Broadcast, *at the time it withheld payment,* had based its nonpayment of taxes on a good faith belief that the equipment was exempt from tax because it was purchased for resale, it would not be subject to a penalty. *See Hales Sand & Gravel, Inc. v. State Tax Comm'n,* 842 P.2d 887, 895 (Utah 1992). While we disagree with Broadcast's interpretation of the purchased for resale exemption, we do recognize that the definition of "sale," if viewed in isolation, could have misled Broadcast into believing the equipment it purchased and stored in Utah was purchased for resale to its subscribers.

*See* Utah Code Ann. §§ 59–12–102(10), –103(1)(a), –104(25), –104(27) (1992). However, simply put, the facts of this case indicate that Broadcast, at the time it withheld payment, did not rely on the definition of "sale."

**10.** Of course the penalty must reflect ten percent of Broadcast's ultimate tax liability. Because we have remanded this case for the limited purpose of clarifying the tax assessed on the Osmond transaction, the $24,180.92 penalty must be readjusted, as appropriate, if Broadcast's tax liability attributable to that transaction is reduced.

Therefore, the tax assessed on the equipment used by Broadcast to provide its satellite services is affirmed. The imposition of the ten percent penalty is also affirmed. However, with regard to the tax assessed on the Osmond transaction, we remand for more adequate factual findings as discussed in this opinion.

GREENWOOD and JACKSON, JJ., concur.