Chad CRAPO, Petitioner,

v.

**INDUSTRIAL COMMISSION OF UTAH; Wherehouse Entertainment, Inc.; and ITT Hartford, Respondents.**

No. 950718–CA.

Court of Appeals of Utah.

Aug. 15, 1996.

James R. Black, Salt Lake City, for Petitioner.

Michael E. Dyer and Dori K. Petersen, Salt Lake City, for Respondents Wherehouse Entertainment, Inc. and ITT Hartford.

Alan Hennebold, Salt Lake City, for Respondent Industrial Commission of Utah.

Before DAVIS, Associate P.J., and JACKSON and WILKINS, JJ.

OPINION

DAVIS, Associate Presiding Judge:

Petitioner Chad Crapo challenges a Utah Industrial Commission Order affirming an administrative law judge's (ALJ) Findings of Fact, Conclusions of Law and Order denying him workers' compensation benefits pursuant to Utah Code Ann. § 35–1–45 (1994). We affirm.

FACTS

Because Crapo failed to "marshal 'all of the evidence supporting the [ALJ's] findings and show that despite the supporting facts, and in light of the conflicting or contradictory evidence, the findings are not supported by substantial evidence,'" *Merriam v. Board of Review,* 812 P.2d 447, 450 (Utah App.1991) (citation omitted), we accept as conclusive the ALJ's findings of facts. *See VanLeeuwen v. Industrial Comm'n,* 901 P.2d 281, 284 (Utah

App.), *cert. denied,* 910 P.2d 426 (Utah 1995). Accordingly, we recite the facts as determined by the ALJ.

During the dates relevant to this appeal, Crapo, then nineteen years old, was employed by Wherehouse Entertainment, Inc. as a sales clerk. In April 1994, Crapo and a fellow Wherehouse employee began stealing a number of items from the store, including "three CD disks, one Sony disk player, and four laser [video] disks." Additionally, Crapo was granting unauthorized employee discounts to "frequent customers," as well as hiding voided receipts in the store's ceiling. Emily Smith, Wherehouse's store manager, became aware of these incidents and consequently contacted the store's regional Loss Control Manager, Jeff Gimber.

After being informed of Crapo's illegal acts, Gimber instructed Smith to document and maintain a record of Crapo's unlawful activities. Upon observing Crapo hiding additional voided sales receipts in the store's ceiling, Smith again contacted Gimber and was told that he would travel to Utah from his southern California location the following day.

On May 19, 1994, Gimber arrived at the store, whereupon Smith instructed Crapo to report to the manager's office located in the rear of the store. Once in the manager's office, Gimber confronted Crapo regarding the thefts that had taken place. After Gimber warned Crapo that police involvement was a possibility, Crapo confessed that he had stolen certain items from the store and that he had given unauthorized discounts on store merchandise. During Gimber's interrogation, Crapo was visibly upset, even crying at times.

Gimber then directed Smith to take Crapo to Crapo's home to retrieve the stolen store merchandise. Crapo protested this directive, and, suggesting that he could be trusted, offered to retrieve the items from his home alone. Based on Crapo's prior unlawful conduct, Gimber ruled out this alternative. Smith assented to Gimber's wishes.

Prior to leaving the store, Crapo was left alone in the manager's office for approximately twenty minutes, during which time, at Gimber's direction, he wrote out a confession which included a list of the items he had stolen. Accounting for the reason behind his unlawful acts, Crapo's confession stated, "for whatever reason why I don't know other th[a]n the thrill of the kill so to speak."

After Crapo completed his confession, Smith, using her own vehicle, drove Crapo to his home. On the way to his house, Smith observed that Crapo remained upset, crying and apologizing to Smith for his actions. On arriving at Crapo's home, Smith accompanied Crapo into the house whereupon Crapo asked to be excused so that he could use the restroom. Crapo went alone to a room adjoining the garage where he kept a 20–gauge shotgun.

Having secured his shotgun, Crapo placed the barrel of the weapon into his mouth and pulled the trigger. The ensuing blast failed to kill the upset youth. Nonetheless, the shotgun's discharge resulted in the loss of some teeth and a portion of Crapo's jaw. Crapo then reloaded the weapon and again attempted to commit suicide. In his wounded state, Crapo loaded the second round upside down precluding a second, potentially deadly, blast.

In response to Crapo's Application for Hearing, the ALJ held a plenary hearing. Specifically, as described by the ALJ, "[a]t the time and place set for the evidentiary hearing, it was determined by and through counsel, that an evidentiary hearing would not be required at this time, in that the threshold issue involved in this case is a legal one.... The parties agreed that the Administrative Law Judge could determine the issue based on the hearing memoranda prepared by the parties, and depositions of the applicant and of Emily Smith." Thus, having reviewed the entire record, the ALJ entered his Findings of Fact, Conclusions of Law and Order.[1]

**1.** Procedurally, Crapo claims that "on the day set for hearing, June 2, 1995, the [ALJ] ruled that a threshold legal issue of whether the injuries were '... purposely self-inflicted' precluded recovery."

Crapo further asserts that "rather than taking evidence from witnesses, the [ALJ] chose to rule on the defendant's Motion to Dismiss determining that it is a legal issue as to whether or not the

The ALJ noted that there was no evidence presented to suggest that anyone had recommended to Crapo that he injure himself. Moreover, the ALJ determined that Crapo "knew that Wherehouse Entertainment was not going to press charges as long as the merchandise was returned." Hence, the ALJ found that nothing other than Crapo's own guilt led Crapo to conduct himself in a manner bent on his own death. In concluding his factual findings, the ALJ determined that "Crapo did not attempt suicide for any reason other than the fact that he had been caught stealing from his employer. There was no preceding compensable injury which led to the suicide [attempt]."

Acting pursuant to Crapo's Motion for Review of the ALJ's Findings of Fact, Conclusions of Law and Order, the Utah Industrial Commission affirmed the decision of the ALJ. Crapo appeals.

## STANDARD OF REVIEW

■ Utah appellate courts may grant relief from an agency decision if the agency's interpretation or application of statutes is "an abuse of discretion delegated to the agency by statute." Utah Code Ann. § 63–46b–16(4)(h)(i) (1993). However, we accord such deference to an agency's statutory interpretation *only* "when there is a grant of discretion to the agency concerning the language in question, either expressly made in the statute or implied from the statutory language." *Morton Int'l, Inc. v. State Tax Comm'n,* 814 P.2d 581, 589 (Utah 1991); *accord Nucor Corp. v. State Tax Comm'n,* 832 P.2d 1294, 1296 (Utah 1992); *Cross v. Board of Review,* 824 P.2d 1202, 1204 (Utah App. 1992).

■ The statute at issue here, Utah Code Ann. § 35–1–45 (1994), contains neither an express nor an implied grant of discretion to the Industrial Commission. *See Cross,* 824 P.2d at 1204. Accordingly, we are "in as good a position as the agency to interpret the general statutory provision in question."

*Niederhauser Ornamental & Metal Works Co. v. State Tax Comm'n,* 858 P.2d 1034, 1036 (Utah App.), *cert. denied,* 870 P.2d 957 (Utah 1993). We thus review the Industrial Commission's interpretation and application of the worker's compensation statute nondeferentially for correctness. *See State v. Pena,* 869 P.2d 932, 936 (Utah 1994); *see also King v. Industrial Comm'n,* 850 P.2d 1281, 1284–92 (Utah App.1993) (discussing at length appellate standards of review for agency decisions).

## ANALYSIS

■ Crapo's claims are controlled by Utah Code Ann. § 35–1–45 (1994), which provides in relevant part,

> Each employee ... who is injured ... *by accident* arising out of and in the course of his employment, wherever such injury occurred, *if the accident was not purposely self-inflicted,* shall be paid compensation for loss sustained on account of the injury....

(Emphasis added.) The issues presented are (1) whether the injuries that Crapo sustained arose by "accident," and, if so, (2) whether Crapo's injuries were "purposely self-inflicted."

Crapo argues that the injuries he sustained were the result of an accident as that term appears in Utah Code Ann. § 35–1–45, and thus are compensable under the Utah Workers' Compensation Act. In *Allen v. Industrial Commission,* 729 P.2d 15 (Utah 1986), the Utah Supreme Court defined "accident" for purposes of section 35–1–45 as "an unexpected or unintended occurrence that may be *either* the cause *or* the result of an injury." *Id.* at 22. In *Allen,* the claimant alleged that he was injured while lifting milk crates from the floor to place them on a cooler shelf. *Id.* at 17. However, Allen testified at trial that before this injury, he had suffered numerous back injuries. *Id.* Accordingly, the ALJ concluded that "there was no 'accident' because there was no identifi-

applicant's injuries were 'purposely self-inflicted.'" Thus, Crapo claims his Motion for Review entered with the Industrial Commission was in response to what Crapo characterizes as the "summary disposition" entered by the ALJ. As stated by the ALJ, this is an erroneous characterization of the procedure below. Accordingly, we do not accept Crapo's characterization of the proceedings below as a "summary disposition."

able event that caused the injury and because lifting the crates of milk was a routine and commonplace exertion expected of the job." *Id.* at 17–18.

In attempting to fashion "a clear and workable rule for future application" of section 35–1–45, the supreme court analyzed prior court decisions which had "failed to distinguish the analysis of the accident question from the discussion of causation elements." *Id.* at 18 (footnote omitted). Accordingly, the court settled on the above given definition of "accident," and in doing so, overturned the ALJ's determination because "the uncontradicted testimony of the claimant [was] that he experienced an unexpected and unanticipated injury to his back as he lifted a crate of milk in the cramped area of the cooler." *Id.* at 27.

Unlike *Allen,* unfortunate as Crapo's injury was, we cannot say that his act of seeking out a shotgun, loading the weapon, placing the weapon into his mouth, discharging the weapon, and then repeating the entire process, though unsuccessfully, in an obvious attempt to further injure himself, was unintended. Nor can it reasonably be said that the injury the shotgun blast caused was unexpected. Hence, the deliberateness of the process through which Crapo was injured demonstrates that both the cause and effect of his injuries were anything but unexpected or unintended. Accordingly, the Industrial Commission appropriately affirmed the ALJ's determination that Crapo's injuries are not compensable under section 35–1–45 of the Workers' Compensation Act because they did not arise by accident.

Having determined that Crapo's injuries did not arise by accident and consequently are not compensable, we need not consider the "purposely self-inflicted" prong of the section 35–1–45 inquiry.[2]

## CONCLUSION

The ALJ's Findings of Fact, Conclusions of Law and Order, affirmed by the Industrial Commission, correctly applied Utah Code Ann. § 35–1–45 (1994). Therefore, the decision of the Industrial Commission is affirmed.

JACKSON and WILKINS, JJ., concur.

---

**2.** We do not address the effect of our decision on Crapo's ability to pursue a tort claim. *See Jackson v. Brown,* 904 P.2d 685 (Utah 1995); *Hamilton v. Parkdale Care Center, Inc.,* 904 P.2d 1110 (Utah App.1995).